579 P.2d 559

**STATE of Arizona, Appellee,**

v.

**James Franklin FERGUSON, Appellant.**

**Nos. 3874, 4025 (Consolidated).**

Supreme Court of Arizona,
En Banc.

April 25, 1978.

Rehearing Denied May 31, 1978.

Bruce E. Babbitt, Former Atty. Gen., John A. LaSota, Jr., Atty. Gen. by William J. Schafer III, Diane DeBrosse Hienton and Crane McClennen, Asst. Attys. Gen., Phoenix, for appellee.

J. Douglas McVay, Phoenix, for appellant.

HAYS, Justice.

The appellant, James Franklin Ferguson, and a codefendant, Donnie Lyle Davis, were charged by information with first degree murder and armed robbery. Appellant submitted the determination of his guilt or innocence to the court upon a stipulated record. The trial court found appellant guilty of both charges and appellant was sentenced to serve 25 to 50 years for the armed robbery and 25 years to life for first degree murder, sentences to run consecutively. This appeal followed. The Supreme Court has jurisdiction pursuant to A.R.S. §§ 13–1711 and 13–1713.

A few months after Ferguson was sentenced, the trial of his codefendant Davis began. Ferguson was called as a witness for the prosecution, but he refused to testify even after the trial judge ordered that he be given immunity for his testimony. Ferguson claimed that answering questions might deprive him of life without due process of law. The trial court told Ferguson that it would direct the warden of the Arizona State Prison to place Ferguson in "protective custody" if the trial court was persuaded that Ferguson's life was in danger. Appellant still refused to answer any questions and was held in contempt.

Ferguson explained to the trial court that he had to serve a minimum of 25 years at the Arizona State Prison and that he had learned that it was a "convict's law" that persons who testify against another are marked for death. He stated that in his short time at the prison, he had already heard about some prisoners who were stabbed even though they were in protective custody. Ferguson also described the bleak condition of the cells used for protective custody and the extreme limitations upon one's liberty while in protective custody. Prisoners in protective custody cannot take part in educational programs or recreation. Ferguson testified that he did not believe he could remain sane if he had to serve his 25-year minimum sentence in protective custody.

The state offered no evidence contradicting Ferguson's testimony concerning conditions at the prison or the danger to prisoners who testify for the state.

The trial court reaffirmed its finding of contempt and sentenced Ferguson to six months in the Maricopa County Jail. The trial court ordered that this sentence be consecutive to the sentences previously imposed, that the contempt sentence begin as of the date of the contumacious conduct, and that Ferguson be retained at the Maricopa County Jail for the immediate service of the contempt sentence. The warden of the State Prison was ordered not to credit the time served for contempt against Ferguson's other sentences. Ferguson has appealed from the judgment of contempt and from all the orders relating to the contempt sentence. This appeal was consolidated with the appeal in the armed robbery and murder case.

## THE CONTEMPT CONVICTION AND SENTENCE

The conviction of contempt and the sentence must be upheld. We are aware of the problems at the Arizona State Prison. Although efforts are being made to take corrective measures at the prison, we realize that it may be some time before conditions are fully improved. However,

we do not believe that the prison's present problems change the law of contempt. When Ferguson refused to testify at Davis's trial, it was proper for the trial court to find him in contempt and to sentence him to six months in the county jail. A.R.S. §§ 12–861, 12–863 and 13–341 and 17 A.R.S. Rules of Criminal Procedure, rule 33. However, the trial court erred in ordering Ferguson to serve the sentence for contempt before returning to the state prison to complete the sentences for murder and armed robbery. When the trial court ordered Ferguson to jail for contempt, it modified the murder and armed robbery sentences by delaying their completion for six months. By the time Ferguson had been convicted of contempt, a notice of appeal had already been filed in the murder and armed robbery case. Once a notice of appeal has been filed, the trial court cannot modify a sentence because the trial court no longer has jurisdiction over the matter. *Eyman v. Cumbo*, 99 Ariz. 8, 405 P.2d 889 (1965). Any time served on the contempt sentence must be credited toward the murder and armed robbery sentences. Pursuant to our powers under A.R.S. § 13–1717, the sentence of six months in jail is imposed to be served at the conclusion of the sentence or sentences now being served in the Arizona State Prison.

## THE ARMED ROBBERY AND MURDER

The record indicates that on the evening of July 2, 1976, Ferguson and Donnie Lyle Davis were drinking at the Dancing Sunshine Bar on East McDowell Road in Phoenix. Ferguson suggested that they obtain some money by calling a cab, having the driver drive out to the desert, then shooting the driver and taking his money. Either Davis or Ferguson did call for a cab, and Lorenz answered the call. Lorenz was instructed to drive to an isolated area in Maricopa County. Ferguson asked him to stop because he needed to urinate. Ferguson got out of the cab, drew a gun, and stood behind Lorenz who was still seated at the wheel of the cab. Ferguson then shot Lorenz once in the head. Apparently Lorenz was not threatened before he was shot;

Ferguson just suddenly shot him without any warning.

Lorenz was then taken from the cab and laid on the ground. Ferguson turned Lorenz over and started to go through his pockets looking for money, but didn't complete this search. Ferguson then told Davis to get in the cab and act like a passenger. Ferguson drove the cab away, leaving the wounded Lorenz lying at the edge of the little traveled road. Lorenz was discovered later that night and taken to a hospital where he died soon afterwards.

Two or three days after July 2, 1976, Ferguson sold a .38-caliber revolver. Sheriff's deputies recovered the revolver. Tests indicated that the gun could have fired the bullet taken from Lorenz's skull after his death. Ferguson told the man to whom he had sold the gun that he had "wasted a dude."

## WAS APPELLANT'S ARREST UNLAWFUL?

Appellant argues that his confession should have been suppressed as the fruit of an unlawful arrest because officers did not have an arrest warrant when they entered a home in which he was a guest to arrest him.

The following facts are pertinent to a determination of lawfulness of appellant's arrest:

About two days before Ferguson's arrest, local officers received a call from California officers who said that a person had contacted them offering to give information about a homicide in the Phoenix area. Phoenix officers flew to California and returned with the "informer", Donnie Davis, who later was charged as a codefendant in the Lorenz murder. Davis came to Phoenix for questioning about 24 hours before Ferguson's arrest. Davis told police that Ferguson had simply walked up behind Lorenz and shot him without any warning. He also said that Ferguson would not allow himself to be taken alive and that Ferguson's wife was so "moonstruck" on him that she would do anything to help him resist

arrest. Davis had associated closely with the Fergusons both before and after the crime and apparently had even lived with them. Officers believed Ferguson was likely to use violence to resist arrest.

A few hours after the Davis interview, Ferguson's picture and a public plea for any information regarding his whereabouts was broadcast on the 6:00 P.M. TV news. Shortly thereafter, the Mesa police received a call from a person who had knowledge of Ferguson. It was approximately 7:00 P.M. by the time this information was relayed to the sheriff's officers investigating the Lorenz murder; the officers were contacted at their homes. These officers went to the sheriff's department and then followed up the telephone tip by interviewing a Mr. Christie in east Phoenix.

Christie told officers that he had a recent telephone number for Ferguson. At the conclusion of the Christie interview, officers contacted the telephone company to determine what address the telephone number served. By this time it was close to 9:00 P.M. Since there were only three sheriff's officers available at this time, two of them were dispatched to stake out the address (a residence) while support personnel from the Phoenix Police Department were requested; by the time support units arrived at the address, it was nearly 10:00 P.M.

Christie was asked to call the number Ferguson had given him to make sure that Ferguson was inside the residence. There was still some doubt regarding Ferguson's whereabouts because Christie told officers he had taken the Fergusons to the bus station and given them money to leave town. Davis also said Ferguson had left town. Confirmation that Ferguson was in the house reached the officers waiting outside about 10:00 P.M. Ferguson was arrested about 10:15 P.M.

To effect the arrest, officers knocked on the front door of the residence, identified themselves, and stated that they were seeking Ferguson. The owner (or renter) of the home, Dave Anthony, told officers that Ferguson was not there; officers entered and found Ferguson and his wife hiding behind a baby crib in a dark bedroom.

Arizona has two statutes which in relevant part provide:

§ 13–1403. Arrest by officer without warrant

A peace officer may, without a warrant, arrest a person:

1. When he has probable cause to believe that a felony has been committed and probable cause to believe the person to be arrested has committed the felony.

§ 13–1411. Right of officer to break into building

An officer, in order to make an arrest either by virtue of a warrant, or when authorized to make such arrest for a felony without a warrant, as provided in § 13–1403, may break open a door or window of any building in which the person to be arrested is or is reasonably believed to be, if the officer is refused admittance after he has announced his authority and purpose.

We are well aware that in announcing the public policy of the state of Arizona on arrests, the legislature of the state cannot override any strictures placed by the Fourth Amendment of the United States Constitution. Recently, in *State v. Cook*, 115 Ariz. 188, 564 P.2d 877 (1977), this court discussed the question of a warrantless entry into a home to effect an arrest. The majority took the position that the statute, A.R.S. § 13–1411, had not been complied with, and that the circumstances were not exigent.

The United States Supreme Court as yet has not come forth with a definitive ruling on this point. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), footnote 13 in the majority opinion, comments on the fact that this point is unsettled.

In *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the United States Supreme Court held that the warrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment. Thereafter, in *United States v. Santana*, 427 U.S. 38,

96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the Court held that a warrantless arrest set in motion in a public place may not be defeated by flight to a private place. Neither of these cases provides the answer to our specific issue.

■■ We hold that where there are exigent circumstances, a warrantless arrest in a private home may be made if there is probable cause. Exigent circumstances exist here. As previously set forth in the recital of facts: the person sought to be arrested was believed to be armed and dangerous, his whereabouts had just been established, he had previously been on the move, and his apprehension appeared to be difficult and dangerous.

The officers complied with A.R.S. § 13–1411 and then proceeded to make the arrest. Since the arrest was legal, the confession should not be suppressed on this ground.

## WAS APPELLANT'S CONFESSION INVOLUNTARY?

Appellant urges that his confession should have been suppressed because it was involuntary. He claims that he confessed only because officers threatened to put his wife in jail if he did not confess. In essence, appellant argues that the police knew that his wife had nothing to do with the crime, but they still handcuffed her, took her to the station, and photographed and fingerprinted her to make appellant fear that his wife was about to be jailed. Appellant says that he was so determined to protect his wife from whatever she might have to endure in jail that he gave a statement indicating that he killed Lorenz. Appellant states that officers told him they would "lock up" his wife if he didn't give such a statement.

The trial court ruled that the confession was admissible and found that the police had acted properly in bringing appellant's wife to the station for questioning and that the police had used no improper inducements to obtain the appellant's confession. The record justifies this ruling of the trial court.

■ The facts of each case must be reviewed in determining voluntariness where it is claimed that concern for a relative motivated the confession. Significant factors in such an analysis include whether a defendant has agreed to answer questions following Miranda warnings, People v. Steger, 16 Cal.3d 539, 128 Cal.Rptr. 161, 546 P.2d 665 (1976); whether the defendant rather than police initiate the discussion concerning the relative, State v. Jordan, 114 Ariz. 452, 561 P.2d 1224 (1976); and whether the authorities are honest with the accused, State v. Winters, 27 Ariz.App. 508, 556 P.2d 809 (1976).

■ Even if the police first mention the possibility of jailing a relative, such statements do not make a confession inadmissible where they are not threats or promises to induce a confession, but only point out the obvious fact that if the guilty person is found it will be unnecessary to hold others. Pate v. State, 361 P.2d 1086 (Okl.Cr.1961); Vogt v. United States, 156 F.2d 308 (5th Cir. 1946).

■ The record in this case shows that police had reasonable grounds to suspect that the wife might be involved in the murder because of the statement of the codefendant and the unidentified fingerprints found on items associated with the murder; that appellant agreed to answer questions, following Miranda warnings, before any discussion of his wife began; that appellant initiated the conversation regarding what was going to happen to his wife; that officers made no promises to release the wife if appellant confessed, but told him only that she would be released if there appeared to be no evidence to hold her; and that appellant told officers that his confession was voluntary.

This evidence supports the trial court's finding that appellant's confession was not induced by threats or promises but was made voluntarily. It was proper to admit the confession into evidence.

## DOES THE CONVICTION OF ARMED ROBBERY AND FIRST DEGREE MURDER VIOLATE THE "DOUBLE PUNISHMENT" STATUTE?

■ The applicable statute, A.R.S. § 13–1641, provides:

**Different punishments for same offense; limitation and bar**

An act or omission which is made punishable in different ways by different sections of the laws may be punished under either, but in no event under more than one. An acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other.

The elements of the two offenses with which we are concerned are: Murder, 1) the unlawful killing; 2) of a human being; 3) with malice aforethought. A.R.S. § 13–451. Armed Robbery, 1) the felonious taking; 2) of personal property; 3) in the possession of another; 4) from his person or immediate presence; 5) against his will; 6) by means of force or fear. A.R.S. § 13–641.

In *State v. Tinghitella*, 108 Ariz. 1, 491 P.2d 834 (1971), this court adopted an identical elements test for determining whether A.R.S. § 13–1641 applies to a particular case. Thereafter, this court, in a number of other decisions, has applied the rule enunciated in *Tinghitella*. *See State v. Mays*, 108 Ariz. 172, 494 P.2d 368 (1972); *State v. Williams*, 108 Ariz. 382, 499 P.2d 97 (1972); *State v. Jorgenson*, 108 Ariz. 476, 502 P.2d 158 (1972); *State v. Howes*, 109 Ariz. 255, 508 P.2d 331 (1973); *State v. Cassius*, 110 Ariz. 485, 520 P.2d 1109 (1974); *State v. Ramirez*, 111 Ariz. 504, 533 P.2d 671 (1975); *State v. Helmick*, 112 Ariz. 166, 540 P.2d 638 (1975). Under this test, the court must eliminate the evidence supporting the elements of one charge and determine whether the remaining evidence supports the elements of the remaining charge. We have applied this test to the facts of our instant case. It is apparent that the elimination of the evidence supporting the elements of first degree murder does not leave sufficient evidence to support the armed robbery charge. Although the first five elements of robbery are supported by the remaining facts, the sixth element "by means of force or fear" is not supported. This evidence is necessary to support the first two elements of the murder charge: the unlawful killing of a human being. Under the peculiar facts of our instant case, the taxicab driver was shot in the head from behind, apparently with no knowledge of what was about to take place. This shooting was the only force available to support the subsequent acts which might otherwise be characterized as robbery. Having applied the *Tinghitella* test, we find that the evidence will not additionally support the charge of robbery. Accordingly, the robbery conviction and sentence are set aside. *State v. Taylor*, 109 Ariz. 267, 508 P.2d 731 (1973).

The judgment of conviction and the sentence for murder are affirmed; the judgment of conviction and the sentence for robbery are set aside; and the judgment of conviction and the sentence for contempt, as modified, are affirmed.

CAMERON, C. J., and HOLOHAN and GORDON, JJ., concurring.

STRUCKMEYER, Vice Chief Justice, specially concurring:

I concur in the disposition of this case. The facts do not support a charge of robbery. However, I wish to express my dissatisfaction with the rule of *State v. Tinghitella*, 108 Ariz. 1, 491 P.2d 834 (1971). In my opinion, the identical elements test adopted there does not properly enunciate when two offenses are distinguishable so as to permit the imposition of cumulative punishment. It relieves a criminal of responsibility for some of his criminal acts. I reserve for a more appropriate time any discussion as to what the proper rule should be.