598 P.2d 1005

**The STATE of Arizona, Appellant,**

v.

**Bernita LOVE and James Ford, Appellees.**

**No. 2 CA–CR 1307.**

Court of Appeals of Arizona, Division 2.

Sept. 19, 1978.

Rehearing Denied Oct. 25, 1979.

Stephen D. Neely, Pima County Atty., by Richard Louis Strohm, Deputy County Atty., Tucson, for appellant.

Richard D. Burris, Tucson, for appellee Bernita Love.

John M. Neis, Pima County Public Defender, by David C. Anson, Asst. Public Defender, Tucson, for appellee James Ford.

OPINION

HOWARD, Judge.

An order suppressing all the evidence seized from a Tucson residence and two vehicles parked on the premises is the subject of this appeal by the state. The trial court apparently concluded that the state had failed to meet its burden of proving by a preponderance of the evidence that the seizure of the narcotics involved had been lawful. Rule 16.2(b), Arizona Rules of Criminal Procedure, as amended.

On May 9, 1977, at approximately 4:00 a. m., an informant contacted the narcotics section of the Tucson Police Department to set up a deal for the purchase of 1,000 pounds of marijuana at $75 per pound from one Frank Ford. He was told to go ahead and set the deal up. It was arranged that Agents Hickey and Crossman would meet with Ford and another person named "Bee" at a Stone Avenue and Grant Road shopping center so that the officers could show

these individuals the $75,000 and the details of the transaction could be worked out.

Agents Hickey and Crossman met the informant and Ford at the shopping center. Ford told them to wait there and he would return shortly. He and the confidential informant then left. About 45 minutes later Ford returned, driving the informant's car. He told the agents to wait there as it would be another half hour before the load "arrived over at the house" and that the informant was waiting back at Bee's house. Hickey said that he would like to talk to the informant so Ford wrote down the telephone number of a pay phone in the shopping center, told Hickey to wait at the phone, and left. About half an hour later the informant telephoned and told Hickey that half the load was there and they were waiting for the other half to arrive. The informant did not indicate any address and Agent Hickey got the impression that other people were there while the informant was talking.

A short time later the informant telephoned again and said that the portion of the load in the house weighed about 355 pounds, that one car had arrived with a load in the trunk and that another car had been sent to pick up the remainder of the load. After the total load arrived, the agents could see it and he would come to get them. The informant subsequently drove over to pick up the agents. He told them he had seen the load in the house and in both cars and felt it was approximately 1,000 pounds they were dealing with. He also said that there were some problems because the people did not want to take the load out of the two cars into the house while it was still daylight. They wanted the agents to come to the house. They would show them the two loads and wait until after dark to load the merchandise into the agents' car. He told them that he felt sure Ford had a gun and that the other people might have guns.

The agents got into their car and followed the informant's car to 301 W. Pastime Road. When they arrived, they observed a pickup truck, a van, a Pontiac GTO and a Ford Torino parked on the premises.

The informant went into the house and got Ford who came out and briefly talked to Hickey and Crossman. He told them to come into the house and he would show them the load. They entered, went through the kitchen, living room and down a hallway into the southwest bedroom where the 355 pounds of marijuana was located. Appellees Love and Miranda were also in the residence. Crossman examined the marijuana in the bedroom and said they would take it.

Miranda then told Ford and the informants to take the agents out and show them the rest of the load in the cars. The agents, Ford and the informant went outside. Ford opened the Ford Torino trunk which was loaded with marijuana. The agents recognized it as marijuana from the smell, the texture and its packaging in kilo bricks. The trunk of the GTO was then opened and it also was loaded with marijuana.

Ford wanted the agents to wait inside the house until dark and then he would help them transfer the marijuana to their car. The agents agreed but said they wanted to move their car off the street. Ford and the informant went into the house. The agents went out to their car and gave a signal over the radio to other agents staked out in the area. They told them they had seen a load inside and "to move in". Several cars then pulled into the area.

As the agents were backing their car up, Ford came out of the same door as before and stood holding the screen door open. Hickey got out of the car, pulled out his badge, told Ford they were police officers and to "freeze". Ford ran back into the house, and the two agents, who were both in plain clothes, kicked the door in and went to the room where the load was. The only people in the room were Mrs. Love and her child.

In addition to Hickey and Crossman, about 12 other narcotics agents and police officers were involved. These other officers were aware in the morning that Hickey and Crossman were working a deal. The two agents were covered by the others dur-

ing the whole period. Radio contact was maintained consistently and the other officers were kept abreast of everything that transpired. The backup force followed Hickey and Crossman as their car followed the informant's car to the house on Pastime Road.

Hickey was questioned as to his attempt to ascertain the address of the house from the informant. He had asked the informant in the morning if he knew the address and was told that he did not. That was the only attempt made to find out the address. When the informant returned in the afternoon, the agents were not concerned about the location of the house because "we were going to be right over there anyway."

Officer Parella, one of the backup officers, testified that he knew about a couple of hours before that the raid was going to take place to take a load of marijuana. About fifteen or twenty minutes prior to the actual raid itself, he knew where the house was located. (This information was relayed by radio.) When he first arrived on the scene, he knew they were going to be making a raid on the house and some cars and that a quantity of marijuana was on the premises. The purpose of the backup force was to provide security for the other officers and to effect a raid and seizure of narcotics. Signals had been prearranged so the backup force would know when to move in and make the arrest. When Crossman and Hickey backed their car up, it meant they had seen the contraband and were going to seize it. They would give by radio communication the signal to raid. The officers were to move into the residence, take the people into custody and seize the marijuana.

Appellees were arrested, the marijuana in the residence and in both vehicles was seized, and the two vehicles were impounded.

At the conclusion of the suppression hearing, the court expressed its concern with the fact that from 10:00 a. m. the police officers had a pre-arrangement to make a raid wherever the marijuana was located; that at least 20 minutes prior to the raid

Hickey and Crossman were taken to the residence where the marijuana was located; that when Hickey backed his vehicle up, the officers were to raid the house; that no consideration at all was given to whether or not there was time or grounds to procure a search warrant; and that the raid was planned irrespective of whether a search warrant should be obtained.

The state contends that the seizure of the contraband without a warrant can be upheld since it fell within one of the classic exceptions to the warrant requirement, i. e. either incident to a lawful arrest or exigent circumstances.

Under the facts here, there is no dispute that the requisite probable cause to arrest existed when Agent Hickey announced that they were police officers and told Ford to "freeze". The threshold question is whether the officers could make a warrantless entry into the house.

Assuming arguendo that the warrantless entry was valid under *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the state failed to prove whether or not the seizure was constitutionally valid under *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) or under the "plain view" doctrine. The record is devoid of any proof of the circumstances of the seizure of the marijuana in the residence.

■ Our Supreme Court has recently held that "where there are exigent circumstances, a warrantless arrest in a private home may be made if there is probable cause." *State v. Ferguson*, Ariz., 579 P.2d 559 (1978). The trial court apparently concluded here that exigent circumstances did not exist to justify the warrantless arrest. The fact that a raid was pre-arranged, the failure to explain why no attempt was made to ascertain the address from the informer and the fact that no consideration was given to secure a search warrant or to secure the premises while trying to obtain one would justify a conclusion that the "emergency" was foreseeable. Therefore the emergency justification was not availa-

ble to support the police action. See *United States v. Rosselli,* 506 F.2d 627 (7th Cir. 1974). Compare *United States v. Curran,* 498 F.2d 30 (9th Cir. 1974).

As to the marijuana seized from the vehicles, no evidence was presented as to the circumstances of the seizure. We do not even know when the vehicles were searched. In fact the record reflects that no attempt was made to distinguish this warrantless seizure from the one which occurred in the residence. While it is true that the warrant requirement may, under certain circumstances, be dispensed with when vehicles are involved, there was no showing of exigent circumstances to justify seizure without a warrant. *State v. Sauve,* 112 Ariz. 576, 544 P.2d 1091 (1976).

Since the warrantless seizure of the marijuana was per se unreasonable, the trial court did not err in granting a motion to suppress.

Affirmed.

HATHAWAY, J., and RICHMOND, C. J., concurring.