687 P.2d 1201

**STATE of Arizona, Appellee,**

v.

**Jerry Dean WOODS, Appellant.**

No. 5637.

Supreme Court of Arizona,
En Banc.

April 17, 1984.
Reconsideration Denied May 30, 1984.

Robert K. Corbin, Atty. Gen., William J. Schafer, III, Chief Counsel, Criminal Division, Jack Roberts, Asst. Attys. Gen., Phoenix, for appellee.

J. Douglas McVay, Phoenix, for appellant.

FELDMAN, Justice.

Jerry Dean Woods (defendant) was convicted by a jury of first degree murder and armed robbery. Defendant was sentenced to life imprisonment without possibility of parole for twenty-five years on the murder charge, and to a term of twelve years for armed robbery; the terms are to be served consecutively. Defendant filed a timely appeal; we have jurisdiction pursuant to A.R.S. § 13–4033; Ariz. Const. art. 6, § 5(3) and Ariz.R.Crim.P.Rule 31, 17 A.R.S.

The issues raised on appeal are:

I. Did the trial court abuse its discretion by not permitting defendant to impeach a witness by cross-examination about a recent act of misconduct, where the witness had not been convicted of the act in question?

II. Did the trial court err in precluding defendant from playing the tape recorded statement of a key state witness for impeachment purposes, where the witness acknowledged all prior inconsistencies while testifying?

III. Was the prosecutor guilty of misconduct warranting reversal?

IV. Was the defendant entitled to separate forms of verdict distinguishing between felony murder and premeditated murder; if so, was the error fundamental?

V. Did sentencing defendant to consecutive terms violate the double punishment provisions of A.R.S. § 13–116?

## FACTS

Defendant and his accomplice, Jeffrey Lange, gave sharply divergent stories of what occurred. It is clear that defendant and Lange intended to hitchhike to Colorado, where Lange had been working. The victim, Pat Eppler, agreed to take the two part of the way. According to defendant, the victim was to drive them to the freeway north of Phoenix where they were to commence hitchhiking. According to Lange, Eppler was to drive them as far as Flagstaff. The three left Phoenix from the home of Lange's mother in Eppler's truck during the early morning of June 8, 1981.

They stopped for gas and then proceeded north on the Black Canyon Freeway, headed for Flagstaff. Lange testified at trial that he fell asleep and was awakened sometime later by the defendant. He realized that the truck was stopped on the off-ramp at the freeway interchange. Lange testified that defendant then got out of the truck and joined the victim, who was already outside the truck. Lange testified further that he then heard a shot, looked over his left shoulder and saw the victim falling to the ground. Lange then jumped out of the truck and asked the defendant what he was doing, and defendant responded that Lange should shut up and help load the body into the back of the truck. Lange also testified that about one week later, defendant admitted that he had shot the victim in the ear.

After the shooting, defendant drove the truck several miles further north on the freeway before pulling off onto a dirt road for another three or four miles. Lange testified that defendant then stopped the truck and told him to help unload the body. Lange refused to comply and defendant removed the body from the back of the truck and left it in the desert, several miles north of Carefree. Defendant and Lange then took the truck to Colorado where defendant "sold" the truck for $50. Lange admitted disposing of the gun in Colorado, stating that he had done so because when defendant was drunk, he would wave the gun around. Lange and defendant left Colorado for Arkansas, where they stayed for about a month. Defendant left Arkansas to return to Phoenix, and Lange followed about one week later.

Meanwhile, the parents of the victim had retained the services of a private detective, Michael Roe, to investigate the disappearance of their son. When Lange returned to Phoenix, Roe located him and questioned him about Eppler's disappearance. Lange's conversation with Roe was tape recorded. Lange agreed to accompany Roe to the police station, where he turned himself in. The police questioned Lange on several occasions. After taking Lange's

statements the police obtained a warrant for defendant's arrest. Defendant was arrested and interviewed by two detectives. After being given his *Miranda* rights, defendant confessed that he shot the victim in the right ear with a Derringer, using .22 magnum, hollow point ammunition. In his confession, defendant told the police that Eppler had agreed to take defendant and Lange to the freeway north of Phoenix so that they could hitchhike to Colorado. According to defendant, when he stopped at the Carefree off-ramp to let the defendant and Lange out, Eppler got out of the truck first. Defendant said that he then asked Lange what to do and Lange replied that he "did not want to walk"; defendant responded "Man, what do you want me to do, just shoot him?" Defendant first said that Lange responded "yes", and later said that he was not sure, but that Lange had been in favor of shooting the victim and had served as a lookout. Defendant went on to confess that he then got out of the truck and shot Eppler by putting the gun in Eppler's ear.

Lange was originally indicted along with defendant for first degree murder and armed robbery. Shortly before trial, the state entered into a plea agreement with Lange, whereby the state agreed that in exchange for truthful testimony Lange would only be charged with theft, and the prosecution would recommend probation. Although the terms of the plea agreement had been formulated and agreed upon, at the time of defendant's trial the county attorney had not yet signed the plea agreement, nor had Lange formally pled to a reduced charge.

Lange's trial testimony differed in some respects from the statements that he had originally given Roe and the police officers. He consistently maintained, however, that defendant had shot Eppler and that he had not known that defendant contemplated such an act. Defendant's trial testimony also differed from that contained in his confession. The difference was major. At trial, defendant claimed that Lange, not he, had killed the victim.

## I. *Did the trial court abuse its discretion in not permitting defendant to impeach a witness by cross-examination about a specific instance of conduct not amounting to a conviction?*

Defendant asserts that the trial court grossly abused its discretion by restricting his cross-examination of Lange about a charge of theft by fraud in Arkansas. The alleged theft occurred shortly after the murder. Lange had returned a purchase to an electronics store, received a refund check and cashed it. Through a computer error, he received a second refund check, which he also cashed. A charge of theft by fraud was filed, but later dropped when restitution was made. Before opening statements in the case at bench, defendant informed the court that he planned to use this act for impeachment purposes on cross-examination and to raise the issue in his opening statement. The prosecutor acknowledged that if Lange were asked about the act, he would admit to it. Defendant argued that this questioning was proper under Arizona Rules of Evidence, Rule 608(b), 17A A.R.S. The trial court ruled that, absent a conviction, the "act" could not be used. When defendant raised the issue again before Lange testified, the trial court apparently then ruled that the act was not probative of truthfulness and therefore could not be used in cross-examination to impeach Lange.

Rule 608(b), adopted in Arizona in 1977, states in relevant part:

(b) Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than by conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, ....

17A A.R.S. Rules of Evidence, Rule 608(b).

This court has not had occasion to interpret Rule 608(b) since its adoption. In decisions made prior to adoption of Rule 608,

Arizona was aligned with the minority of jurisdictions prohibiting the use of specific acts of misconduct on cross-examination of a witness, unless the witness had been convicted of a crime based on that misconduct. *State ex rel. Pope v. Superior Court*, 113 Ariz. 22, 24, 545 P.2d 946, 948 (1976). *See also State v. Harris*, 73 Ariz. 138, 142, 238 P.2d 957, 959 (1951). As we noted in *State ex rel. Pope v. Superior Court, supra,* there are persuasive reasons for this restriction. One is that such matters are collateral and would unnecessarily consume time and confuse issues. *Id.* 113 Ariz. at 24, 545 P.2d at 248. *See also* related discussion of relevancy problems, IIIA Wigmore, *Evidence* § 982, 839–840 (Chadbourn rev. 1970). Perhaps a more serious problem is the potential for abuse inherent in permitting cross-examination regarding specific acts. Protection of a witness against the potential that he will be questioned about all his past conduct is vital to encourage witnesses to appear and give testimony, as well as to protect them from the prejudicial effect that such allegations, even if denied, carry to the jury. *State ex rel. Pope,* 113 Ariz. at 24–25, 545 P.2d at 948–949; Wigmore, *supra,* § 979, and generally §§ 980a, 983. These reasons are also discussed by McCormick, *Evidence* § 42, 83 (2d ed. 1972).

 The comment to our rule notes that *State ex rel. Pope v. Superior Court* "is consistent with and interpretative [sic] of Rule 608(b)." However, the federal Advisory Committee's notes and the plain wording of the rule itself indicate that this comment is an incomplete characterization. Despite prior authority, under the plain wording of the rule specific acts not amounting to convictions are admissible, subject, of course to the limitations of the rule itself.[1] We hold, therefore, that under Rule 608(b) the trial court has discretion to allow cross-examination of a witness about his specific acts of misconduct, if they are probative of truthfulness, even though the witness has not been convicted of any crime in connection with those acts. One limitation on this discretion is that the use of such acts is limited to cross-examination of the witness; the acts may not be proved by extrinsic evidence. Additionally, the utility of the evidence must be weighed by the trial judge against the possibility of prejudice under Rule 403, Ariz.R.Evid. In the case at bench the trial judge first ruled that she had no discretion to exercise because the act could not be used absent proof of conviction of crime; however, her second ruling evinced use of discretion. She ruled that the act was not probative of truthfulness. On this record, that ruling was properly within the discretion of the trial judge;[2] we find no error.

1. The act must be probative of truthfulness, may not be proved by extrinsic evidence, and is admissible at the discretion of the court. Since our Rule 608(b) is drawn from the federal rule, the notes of the federal Advisory Committee are instructive.

 Particular instances of conduct, though not the subject of criminal conviction, may be inquired into on cross-examination of the principal witness himself or of a witness who testifies concerning his character for truthfulness. Effective cross-examination demands that some allowance be made for going into matters of this kind, but the possibilities of abuse are substantial. Consequently safeguards are erected in the form of specific requirements that the instances inquired into be probative of truthfulness or its opposite and not remote in time. Also, the overriding protection of Rule 403 requires that probative value not be outweighed by danger of unfair prejudice, confusion of issues, or misleading

the jury, and that of Rule 611 bars harassment and undue embarrassment.
 Notes of Advisory Committee on Proposed Rules, Fed.Rules Evid. Rule 608, 28 U.S.C.A. The Notes of the Committee on the Judiciary of the House explain that the Committee eliminated the part of the proposed rule referring to remoteness in time, and amended the rule to stress the discretionary power of the court regarding the admissibility of such acts. *Id.*

2. Even if the judge had found the act to be probative of truthfulness, it would still have been properly within her discretion to exclude the evidence considering that defendant had ample, persuasive evidence with which to impeach Lange. This included the inconsistencies between Lange's trial testimony and his original statements and the light treatment which Lange was to receive from the state. Further, the record indicates that Lange was cross-examined vigorously on his participation in the crime, including the taking of the truck and its sale.

II. *Did the Trial Court Err by Not Allowing Proof by Extrinsic Evidence of Inconsistent Statements Which Were Acknowledged by the Witness?*

Defendant claims the trial court erred by precluding him from playing Lange's taped statement to the jury, even though Lange had acknowledged all of the inconsistencies between that earlier statement and his trial testimony. When Lange first talked with Roe, the private detective, Roe taped Lange's statement without his knowledge. In this early statement Lange said that he was asleep at the time of the shooting and that he did not learn of the killing until several days later, when defendant told him about it. He initially gave the same statement to the police, but then modified it to the version which he gave at trial, when he testified that defendant woke him before shooting Eppler, that he heard the shot and saw the body fall. The other major inconsistency between the earlier statement and Lange's trial testimony pertained to whether Lange had been seated in the middle of the cab of the truck or against the window. Lange was cross-examined on the inconsistencies and admitted all of them. However, the key part of his testimony remained consistent with his statements; both the statements and the testimony exculpated Lange and identified defendant as the killer. At all times Lange denied any prior knowledge of defendant's intention to kill.

Defendant claims that since Lange was the key government witness, effective impeachment was "critical" and that the jury should have been allowed to listen to the tapes on which Lange made the original statement to Roe. Defendant claims this "would have been extremely helpful to the jury in evaluating Lange's credibility as a witness." Defendant relies on *Bentley v.*

*Alaska,* 397 P.2d 976 (Alaska, 1965), which held that the trial court erred in not admitting in evidence a taped conversation inconsistent with the witness' later trial testimony. The facts in *Bentley* are close to those in the case at bench. A prosecution witness in a trial for assault with a deadly weapon testified that she saw the defendant stab the victim with a knife. The defendant offered the tape recording of a prior conversation with the witness, made without her knowledge, in which the witness stated that she had never seen defendant with a knife. The trial court excluded the tape on the basis that the witness had admitted the inconsistent statements and explained them. The court ruled that these admissions had impeached the witness, so that it was "pointless" to introduce the tape in evidence.[3] The Alaska Supreme Court held that the defendant was entitled to have the recording considered by the jury because it "would have best informed the jury as to the recording's impeaching weight and significance." *Id.* at 978.

Though it is on point, we do not believe that *Bentley* is determinative of the case at bench. In *Bentley*, the taped statement had substantive use on the key element of whether the defendant actually stabbed the victim; at trial the witness claimed to have seen defendant with a knife, while in the taped conversation she denied having seen the defendant with a knife. Which story the jury believed—the one on tape or the one given at trial—had substantive value to establish the guilt or innocence of the defendant. In the case at bench, on the other hand, whether the jury believed Lange's original statement of the events or his version at trial was collateral to a determination of defendant's guilt or innocence. Under either version defendant was guilty.

Thus, his honesty was certainly impugned, his motives for lying were established, his desire to save himself were made obvious and the inconsistencies in his story were emphasized.

3. On a motion to vacate sentence, the Alaska trial court found that counsel had tried to prove specific acts of misconduct through the tape, that it would have been impossible to separate

much irrelevant and prejudicial matter from the few inconsistent statements, that much of the conversation was collateral to the issues at trial, and that it questioned the reliability of the recording both because of the unusual circumstances under which it was made and because the recording contained only part of the conversation. *Bentley v. Alaska,* 397 P.2d at 977.

Only if the jury so doubted Lange's credibility as to disbelieve the *consistent* parts of his testimony (that he did not shoot the victim and that defendant did) would the defendant's guilt or innocence be affected.

Impeachment through prior inconsistent statements by use of extrinsic evidence is governed by Rule 613, Ariz.R.Evid., 17A A.R.S.[4] Defendant claims use of extrinsic evidence is governed by part (b) of the rule. However the rule does not address extrinsic proof of the inconsistent statements in a situation where the witness admits the inconsistencies. The state argues that by conditioning the admissibility of extrinsic evidence of a prior inconsistent statement on the necessity of affording the witness the opportunity to explain or deny the inconsistency, Rule 613 implies that if the witness admits the inconsistencies, the proponent may not prove the inconsistencies through extrinsic evidence. While we agree that the party does not have the "right" to introduce extrinsic proof of the statement where the inconsistencies are acknowledged, we think that does not end the discussion. Although we have not yet addressed the particular situation raised in this case, we have noted that the "real controversy" regarding proof of prior inconsistent statements by extrinsic evidence is whether the cross-examiner may introduce extrinsic evidence after the witness admits having made the prior inconsistent statement. *State v. Hines,* 130 Ariz. 68, 71 n. 2, 633 P.2d 1384, 1387 n. 2 (1981). The prevailing view is that where the witness unequivocally admits the inconsistencies, further or extrinsic proof of the statement is usually unnecessary and, in most jurisdictions, inadmissible. *See generally* 3 Weinstein and Berger, *Weinstein's Evidence* § 613[04] (1982). McCormick considers the prevailing view (inadmissible) to be more expedient, noting that it "saves time and minimizes the calling of witnesses upon what is only a side issue ..." McCormick, *Evidence* § 37 at 73 (2d ed. 1972). "Further, if the witness admits the earlier inconsistency, there will be no need for extrinsic evidence, an additional saving of court time." M. Udall & J. Livermore, *Law of Evidence* § 43 at 75 (2d ed. 1982).

Wigmore is the proponent of the opposing view:

> Even where the witness admits having made the other statements, this does not prevent the opponent from offering it in evidence by his own witnesses; for he may prefer to have it clearly brought out and emphasized, and it would be unfair to restrict him to the unemphatic mode of proving it by the witness' admission and to subject him to the necessity of disputing whether the admission has been full and exact. The purpose of the [foundation question] is not to prove the statement, but merely to warn that it will be proved; and there is no reason why an admission on the stand should cut off the fight to make such proof, for it does not ordinarily in other respects have such an operation.

IIIA Wigmore, *Evidence* § 1037 at 1044 (Chadbourne rev. 1970). Although espousing the prevailing view, McCormick suggests that the judge should have discretion to allow such extrinsic proof. McCormick, *supra* at 73. Weinstein notes that some prior statements will have substantive effect under Rule 801(d), and in such cases "courts may be less likely to curtail further proof even if the traditional foundational requirement is met and the witness admits making the statement." 3 Weinstein & Berger, *supra* at 613–19. We believe

---

4. Rule 613 states:

(a) Examining witness concerning prior statement. In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel.

(b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

*Bentley v. Alaska, supra,* is one of those cases.

■ The reasons most often given for not allowing extrinsic proof where the witness admits the inconsistencies are to promote judicial economy and avoid cumulative evidence. We find those unpersuasive as absolutes when weighed against the interests at stake in a trial. Therefore, we think the best rule to be that admissibility of extrinsic proof of an admitted inconsistent statement is in the discretion of the trial court. Ordinarily, principles of judicial economy will dictate that extrinsic proof should not be allowed. In those situations described by Weinstein or in cases like *Bentley v. Alaska, supra,* in which the statements have substantive use and where the jury must decide which of two inconsistent statements is true, it may well be important for the jury to hear the tone of voice on the tape, see the handwriting on the document, or look at the film and judge the demeanor of the witness. In these situations, despite the consumption of time, the court should allow the extrinsic evidence.

■ We do not believe that the case at bench falls within the latter category of cases. The inconsistencies were patent, were admitted, and the witness impeached severely on other grounds. We do not believe that the trial court's rejection of the offer of the Roe tape was an abuse of discretion.

## III. *Was There Prosecutorial Misconduct Requiring A New Trial?*

Defendant alleges three instances of prosecutorial misconduct—twice during the cross-examination of defendant, and once during the prosecutor's closing argument.

Defendant urges that the total effect of the three incidents make a compelling case for reversal and states that it is "impossible to conclude that the matters complained of here did not have a profound effect on the jury." In addition, defendant urges that the need to discourage and condemn such prosecutorial misconduct requires us to grant a new trial.

■ The first instance cited is the prosecutor's cross-examination of defendant about avowals of proof made by defense counsel in opening statement. In questioning defendant, the prosecutor misstated remarks made by defense counsel in opening statement.[5] Objection was made to this line of questioning, but the trial court overruled the objection, allowing the questions. We believe the questions were improper. Opening statements are not evidence. The attorney's statements were only his avowals of proof. Of course, the subject matter of such avowals are ordinarily proper subjects of cross-examination, which may be designed to emphasize that defendant's testimony is inconsistent with his attorney's avowal of proof on opening statement. However, discrepancies between counsel's avowals of proof and defendant's later testimony or other evidence are matters appropriate for argument, not for cross-examination. *Pool v. Superior Court,* 139 Ariz. 98, 102, 677 P.2d 261, 265 (1984). Similarly, attempts to clarify counsel's avowals by cross-examination of a witness are improper. Such questions tend to permit the witness to speculate and put himself in a bad light. If there is any question regarding the contents of opening statement, it should be addressed to the court reporter and not to

5. On cross-examination, defendant testified that immediately prior to the killing, Jeffrey Lange had removed the murder weapon from defendant's waist band while both men were standing outside the victim's truck. The prosecutor then asked defendant the following questions:

Q. Do you remember the first part of this trial a couple of weeks ago when your defense attorney made an opening statement, don't you?

A. I don't remember everything he said.

Q. In your attorney's opening statement, didn't he stand up and ... tell this jury how Jeff Lange was seated in that cab of the truck, he grabbed the gun from you?

[Defense counsel objected; objection overruled]

Q. Didn't he make that argument to the jury that you are in the cab of the truck when Jeff takes a gun from you?

A. I'm not sure if he did. I don't remember....

the witness. The court erred in overruling the objection to the questions. Defendant argues this error was serious enough to warrant reversal; we do not agree that the error was prejudicial.

◼ Defendant next complains of the portion of the prosecutor's questioning which related to defendant's examination by two psychiatrists "earlier in the case." The psychiatrists had examined defendant as part of the earlier competency proceedings under Rule 11, Ariz.R. of Crim.Proc., 17A A.R.S. Defendant claimed that the questions propounded about the psychiatric examinations violated Rule 11.7(a), which precludes admission, at any proceeding to determine guilt or innocence, of "evidence of any kind obtained under [the Rule 11] proceedings" unless the defendant has introduced evidence intended to rebut the presumption of sanity. Rule 11.7(a), Ariz.R. of Crim.Proc. 17A A.R.S. Defendant objected to the questions which pertained to his examination by the psychiatrists, the names of the psychiatrists and the dates of these examinations. At the bench conference which ensued, the prosecutor argued that since defendant had earlier introduced evidence designed to show his low intelligence,[6] the prosecution was entitled to introduce evidence of intelligence in order to rebut the defendant's evidence, and that the questions which pertained to the psychiatric examinations as part of the Rule 11 proceedings were merely preliminary to a later offer of evidence from the psychiatrists who presumably had tested defendant's intelligence level.

Defendant moved for a mistrial; the court denied the motion. After hearing arguments at a bench conference, the trial judge precluded the prosecution from calling the psychiatrists. Thus, the jury heard nothing more than a suggestion, by question, that the defendant had been examined by two psychiatrists at an earlier stage of the case. We note, therefore, that the literal wording of Rule 11.7(a) was observed since no "evidence" obtained at the Rule 11

proceedings was admitted. Assuming, arguendo, that even the mention of psychiatric examinations at an unspecified, earlier stage of the case also violates Rule 11.7(a), we do not feel that the mere mention of the previous psychiatric examinations rises to the level of prejudicial error.

The most egregious error complained of occurred in the prosecution's closing argument. In response to a portion of argument in which defense counsel had attempted to discredit Lange and the state's case by questioning the plea agreement by which the state had agreed to prosecute Lange only for theft, the prosecutor told the jury that he had good reasons for offering the plea agreement. He went on to invite the jurors to talk to him after the trial about his reasons so that they could learn what he could not tell them during the trial.

Remember one thing, at no time during the trial have I ever given you my reasons for offering Jeff Lange this plea agreement and I will not because I can't. If you want to know why I offered Jeff the plea agreement, ask me outside the court because the only relevance of this plea agreement which he has marked and flashed in front of you is whether that plea offer would make Jeff testify falsely, and if we look at it, it is all irrelevant because he stood up here a minute ago and he told you with the exception of a few minor little details, his testimony here, the additional things that he said Jeff had to say to get the plea agreement was the same as what he told the officers.

◼ We have long recognized that wide latitude is given in closing argument, and that counsel may comment on and argue all inferences which can reasonably be drawn from the evidence adduced at trial. *State v. Zaragoza,* 135 Ariz. 63, 659 P.2d 22, *cert. denied,* —— U.S. ——, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983); *State v. Mincey,* 130 Ariz. 389, 636 P.2d 637 (1981); *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d

---

**6.** Defendant had failed a test to read the Miranda rights card on the stand and thus laid the

groundwork for argument that his confession was not an accurate depiction of the events.

871 (1982); *State v. Gonzales*, 105 Ariz. 434, 466 P.2d 388 (1970). However, such argument must not be based on matters which were not or could not have been received in evidence. *See State v. Zaragoza, supra; State v. Bailey*, 132 Ariz. 472, 478, 647 P.2d 170, 175 (1982); *State v. Neil*, 102 Ariz. 299, 300, 428 P.2d 676, 677 (1967).

█ The argument in question was patently improper. It invited the jury to speculate about matters which had not been introduced in evidence and, even worse, those which could not have been introduced in evidence. By reassuring the jurors' doubts about the evidence through inviting conversation after the trial, the prosecutor improperly vouched his integrity and honesty. This was a serious act of misconduct. *United States v. Roberts*, 618 F.2d 530, 533–534 (9th Cir.1980); *United States v. Garza*, 608 F.2d 659, 663–665 (5th Cir. 1979); *see also Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) (prosecutor has a special obligation to avoid improper suggestions and insinuations, especially assertions of personal knowledge).

The state now attempts to justify the argument by urging that it was invited error. It claims that defense counsel, in final argument, had invited the jury to speculate that the prosecution itself had no real belief in the truth of defendant's confession and had, therefore, made a "deal" with Lange to testify and "give him a walk." Defense counsel had argued that it was fair to infer from the evidence of the deal with Lange that the state must have had some doubt of the truth of the defendant's confession. This argument, too, was improper because it asked the jury to infer that the prosecutor himself doubted the veracity of the confession. We agree that the prosecutor's personal belief in the veracity of defendant's confession is not relevant and should not have been argued by defendant. The state should have objected to that portion of the argument, but did not.

█ The invited error doctrine applies to situations "where evidence adduced or comments made by one party make otherwise irrelevant evidence highly relevant or require some response or rebuttal." *Pool v. Superior Court, supra,* 139 Ariz. at 103, 677 P.2d at 266. It does not, however, make personal views of counsel an appropriate subject for argument and rebuttal. The issue of counsel's personal beliefs may have become relevant and require some response. The proper remedy for such a serious error, however, is objection, motion to strike, and an instruction that the issue is irrelevant and that the jury should disregard the improper comment. The remedy is not a response assuring the jury of the personal beliefs and integrity of the prosecutor. Further, even where the invited error doctrine is applicable to make an otherwise improper or irrelevant subject a proper area of comment, nothing justifies vouching by going outside the record and assuring the jury that there are facts, known to counsel, not admissible in evidence, which will rebut the comments made by the opponent. We follow a rule of trial by law and evidence, not by avowal of counsel. We hold, therefore, that the prosecutor's improper comments cannot be justified under the invited error doctrine.

█ Defendant made no objection to the argument. At the end of final argument the defense moved for a mistrial which the trial judge denied. The defense did not request the court to instruct the jury to disregard the improper portion of the prosecutor's argument. Defendant now claims that the court erred in denying the motion for mistrial. Motions for mistrial on the grounds of misconduct of counsel are addressed to the discretion of the trial court, which will not be disturbed on appeal unless plainly abused. *State v. Robles*, 135 Ariz. 92, 94, 659 P.2d 645, 647 (1983). However, in capital cases, this court will carefully consider such improprieties and will reverse if, based on the circumstances of the particular case, there is any doubt over whether the misconduct influenced the jury. *State v. Bailey, supra.* We think it would have been better had the trial court interrupted the argu-

ment *sua sponte*, ordered the offending portion stricken from the record, and instructed the jury to disregard it. We base this on the serious nature of the impropriety rather than on the probability of improper influence.

In essence, the argument called the jury's attention to the fact that the state had some reason, which it thought valid, to give Lange the benefit of such a plea bargain in return for his testimony. In light of the extensive cross-examination of Lange on that subject, the jury could hardly have been surprised by the injection of the issue and no doubt had already formed their own views as to why the deal was made and what effect it might have had upon Lange's testimony. Acknowledging that the state's case "was not weak," defendant argues that the improper comment in final argument, added to the improper injection of the Rule 11 proceedings during cross-examination and the improper questioning about avowals made by defense counsel during opening statement, combined to deprive the defendant of a fair trial and influence the verdict. We do not agree. Both of the latter incidents were insignificant and were raised and dropped before any harm occurred. *Cf. Pool v. Superior Court, supra.* In light of the evidence of defendant's undoubted participation in the criminal enterprise, his confession, and Lange's statements and testimony—consistent at all times on the question of defendant's culpability—we believe that there is no reasonable possibility that the improprieties influenced the jury's verdict. The improper comment did not refer to any fact which might have shown or established guilt but only invited speculation on a credibility issue which, no doubt, would have been a subject of the jurors' speculation in any event. We find no abuse of discretion in denial of the motion for mistrial. The improper issue was first raised by defendant; we have seen no pattern of this type of improper final argument by the prosecution, and in the absence of prejudice do not, therefore, find it necessary to reverse as a deterrent measure.

## IV. *Did the trial court err in using one form of verdict on the murder charge of premeditated murder and felony murder?*

■ In the indictment, defendant was charged with premeditated murder and, in the alternative, felony murder. Defendant claims that because the jury received only one verdict form ("Guilty" or "Not Guilty") on the murder charge, he was deprived of his "right to be certain that there was a unanimous jury verdict in a capital case," in violation of Arizona Constitution, Art. 2, § 23. Defendant notes that this Court has held to the contrary in *State v. Encinas,* 132 Ariz. 493, 647 P.2d 624 (1982), asserts that case was incorrectly decided, and urges us to reconsider. Defendant claims that he is entitled to a unanimous jury determination with regard to all the elements of either premeditated or felony murder. Because the jury could not differentiate on the verdict form between the two types of first degree murder, defendant claims it is possible that some jurors believed he was guilty only of felony murder while others found him guilty only of premeditated murder.

■ We have repeatedly rejected this argument. Although we agree that violation of the constitutional right to a unanimous verdict would constitute fundamental error and could be raised for the first time on appeal, we have recently reaffirmed our holding that Article 2, § 23 only requires one form of verdict for first degree murder. *State v. Berndt,* 138 Ariz. 41, 672 P.2d 1311 (1983) citing *State v. Encinas, supra.*

> Although defendant is entitled to a unanimous jury verdict on whether the criminal act charged has been committed, the defendant is not entitled to a unanimous verdict on the precise manner in which the act [of first degree murder] was committed.

*State v. Encinas,* 132 Ariz. at 496, 647 P.2d at 627. We find no error in the use of single form of verdict in this case.

**V.** *Did imposition of consecutive sentences for armed robbery and first degree murder violate Arizona's statute prohibiting double punishment?*

Defendant claims that the imposition of consecutive sentences for first degree murder and armed robbery violates A.R.S. § 13–116, which provides, in part, that:

[a]n act or omission which is made punishable in different ways by different sections of the law may be punished under both, but in no event may sentences be other than concurrent.

The statute does not bar double punishment for different acts. It does bar consecutive sentencing or double punishment for a single act or offense. The statute was adopted, at least in part, from California. *See* historical note to A.R.S. § 13–116; *State v. Ballez*, 102 Ariz. 174, 427 P.2d 125 (1967). When first adopted, the statute was worded somewhat differently than § 13–116, and was construed to bar double conviction as well as double punishment. If the defendant had been improperly convicted for a single act under two different laws, the remedy was to "retain the convictions and to remove the lesser sentence." *State v. Ballez*, 102 Ariz. at 175, 427 P.2d at 126. The present statute, A.R.S. 13–116, evinces an intent to permit "double conviction" but as we stated in *State v. Ferguson*, 119 Ariz. 55, 579 P.2d 559 (1978), the statute prohibits consecutive sentencing.

This still leaves the serious problem of determining what is "an act or omission." Neither A.R.S. § 13–116, its predecessor, nor the California statute defines the term. California has struggled with the concept of a "single act" since adoption of its statute in 1872. *People v. Perez*, 23 Cal.3d 545, 551, 153 Cal.Rptr. 40, 43, 591 P.2d 63, 66 (1979). Acknowledging that the legislative purpose was to "insure that a defendant's punishment will be commensurate with his culpability," the California courts have declined to adopt any universal construction directing the proper application of the statute. *Id.* at 551, 153 Cal.Rptr. at 43, 591 P.2d at 66, 67. They have concluded that the statute does apply to any course of conduct which violates more than one statute yet constitutes "an indivisible transaction." What is divisible or indivisible depends, in turn, upon the intent and objective of the actor. If the defendant had multiple, independent criminal objectives, he could be punished for each independent violation, even though the violations were all part of a single course of conduct. *People v. Beamon*, 8 Cal.3d 625, 636, 105 Cal. Rptr. 681, 688–689, 504 P.2d 905, 914 (1973). Finding this broad test not entirely satisfactory, the California courts eventually elaborated on the "intent and objective" test by applying an analysis which seeks to determine whether the various acts in the course of conduct were separate and distinct on the one hand, or "incidental to or the means by which the final objective was accomplished." *People v. Perez*, 23 Cal.3d at 552, 153 Cal.Rptr. at 44, 591 P.2d at 68.

We gave detailed consideration to our version of the statute (then A.R.S. § 13–1641) in *State v. Tinghitella*, 108 Ariz. 1, 491 P.2d 834 (1971). After reviewing our former decisions, not all of which were consistent, and the California decisions, also inconsistent, we held:

In order to dispel any apparent ambiguity in the cases cited, we hold that the most practical method of determining the number of acts which may be punishable under § 13–1641 ... is the identical elements test ....

*Id.*, 108 Ariz. at 3, 491 P.2d at 836. This test is applied by eliminating the evidence supporting the elements of one charge and then determining whether the remaining evidence supports the elements of the other charge. *Id.*, quoting from *State v. Mitchell*, 106 Ariz. 492, 478 P.2d 517 (1970).

*State v. Westbrook*, 79 Ariz. 116, 285 P.2d 161 (1954) appears to be the first case in which the identical elements test was developed and applied in Arizona. *Westbrook* dealt with the prior version of the statute which was then denominated as § 43–6101, A.C.A.1939. The inquiry there

pertained to the double jeopardy portion of the statute;[7] applying the identical elements test, the court held that a defendant who had been acquitted of attempted burglary could later be prosecuted and punished for conspiracy to commit the same burglary.

After reviewing the authorities, we determined in *Tinghitella* that Arizona would continue to follow the identical elements test, that being the most practical manner to determine the issue of double punishment. Both the state and defendant urge us to apply the *Tinghitella* test in this fact situation, but reach divergent results. We first note that the elements of first degree murder are: 1) intentionally or knowingly; 2) causing the death of another person; 3) with premeditation or in the course of the perpetration of specified felonies, of which robbery is one. A.R.S. § 13–1105. The elements of armed robbery are: 1) the taking of property; 2) of another; 3) from his person or presence; 4) against his will; 5) by use or threat of force; 6) with intent to coerce surrender of the property or prevent resistance of the victim; 7) where the perpetrator is armed with or uses or threatens to use a deadly weapon or dangerous instrumentality. A.R.S. §§ 13–1902, 13–1904.

Citing *State v. Ferguson, supra,* defendant contends that after supporting the elements of first degree murder there is no evidence to support the robbery element of use or threat to use force. Since the facts involving the actual use of force (the shooting of the gun) are here necessary to support the murder elements, defendant argues that under the *Tinghitella* test there is insufficient evidence to independently support the robbery conviction and that the double punishment statute is therefore applicable. We did reach such a conclusion in *Ferguson* under very similar facts. We stated:

Under the peculiar facts of our instant case, the taxicab driver was shot in the head from behind, apparently with no knowledge of what was about to take place. This shooting was the only force available to support the subsequent acts which might otherwise be characterized as robbery. Having applied the *Tinghitella* test, we find that the evidence will not additionally support the charge of robbery. Accordingly, the robbery conviction and sentence are set aside.

*State v. Ferguson,* 119 Ariz. at 61, 579 P.2d at 565.

The state argues that the case is distinguishable from *Ferguson.* Here, the state contends, the fact that the gun was placed in the victim's right ear warrants an inference that the victim was aware that a gun barrel was in his ear and thus must have known that he was threatened with force. The trial judge did not apply *Ferguson* and believed that the case was governed by our decision in *State v. Rumsey,* 130 Ariz. 427, 636 P.2d 1209 (1981). In *Rumsey* we distinguished *Ferguson* as follows:

In the instant case [Rumsey], the defendant demanded the victim's wallet and threatened him with a gun prior to shooting him. Even though the victim's wallet was not taken until after the victim was shot and presumably dead, the acts which constituted the robbery were separate and apart from the acts which constituted the murder. The fatal shooting constituted first degree murder independent of the armed robbery. Under the facts of this case, we hold that the intervening crime of murder does not preclude a conviction of armed robbery as well as murder, and the trial court was correct in imposing consecutive sentences for armed robbery and murder.

*Id.* at 430, 636 P.2d at 1212.

Counsel agreed at oral argument that the distinction to be drawn between *Ferguson* and *Rumsey* is to be made on the

---

7. The second part of A.R.S. § 13–116 now states: An acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under the other....

victim's awareness of the crime. Since there was only one use of force, and that must be assigned to support the murder element, under *Ferguson* and *Rumsey* there is no evidence to support the required robbery element of the use or threat of force unless the victim was aware of the threat during the robbery. Correctly perceiving that this was the precise issue, before imposing consecutive sentences the trial judge made an express finding that the victim had been aware, if only for a brief moment, of the gun in his ear and thus aware of the threat of force. Defendant argues that there is no evidence to support that finding. We disagree. The trial judge cited the testimony of the medical examiner to the effect that the gunshot wound in the ear was a "contact wound." The judge inferred from this that the victim must have been aware of the gun barrel in his ear and thus of the impending crime, so that there was a "threat of force." Drawing such inferences from the facts is well within the discretion of the trial court. Neither in the trial court nor here does the defendant make any argument with regard to the effect, if any, of the felony murder rule on A.R.S. § 13–116. We note, however, that there is no question but that the murder here was premeditated and may be sustained independently of the felony murder rule.

■ We hold, therefore, that under the identical elements test approved in *Tinghitella, supra,* there was sufficient independent evidence to support each of the elements of first degree murder and armed robbery. The imposition of consecutive sentences did not violate A.R.S. § 13–116.

In addition to examining the issues raised by defendant, we have searched the record for fundamental error, A.R.S. § 13–4035. We find none. The judgment and sentences are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.