787 P.2d 1056

**STATE of Arizona, Appellee,**

v.

**John A. SERNA, Appellant.**

**No. CR–87–0183–AP.**

Supreme Court of Arizona,
En Banc.

Jan. 23, 1990.

George M. Sterling, Jr., Phoenix, for appellant.

MOELLER, Justice.

## JURISDICTION

Defendant, John Angel Serna, was convicted by a jury of premeditated first degree murder. Following an aggravation/mitigation hearing, he was sentenced to death. Appeal to this court is automatic pursuant to Rules 26.15 and 31.2(b), Ariz.R. Crim.P., 17 A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031 and –4035.

## QUESTIONS PRESENTED

1. Whether, despite the trial court's *Willits* instruction, defendant was denied a fair trial when the state allegedly lost or destroyed evidence.

2. Whether the state knowingly concealed a secret grant of immunity to a material witness in the case.

3. Whether the trial court erred in excluding evidence of the victim's prior bad acts.

4. Whether the state unjustifiably interfered with defendant's right to counsel.

5. Whether the facts justify imposition of the death penalty.

6. Whether the Arizona Constitution requires jury sentencing in death penalty cases.

## FACTS

Because of the nature of some of the issues raised on appeal, we set forth the facts in some detail. On Friday, June 21, 1985, inmate Patrick Chavarria was scheduled for transfer from the prison at Florence to the prison at Tucson. Due to an error on his transfer order, Chavarria was sent to the Perryville prison instead of Tucson. Upon arrival at the Perryville unit where he was to be housed, Chavarria alerted Correctional Services Officer (CSO) Luna to the error, and was, in turn, told that the error would be corrected Monday morning. Chavarria asked CSO Luna

Robert K. Corbin, Atty. Gen. by Jack Roberts, Asst. Atty. Gen., Phoenix, for appellee.

whether inmates Danny Peru and Tommy Contreras were housed at Perryville. Although expressing no fear of them, he said that he did not want to be in the same unit with them. Before leaving his post that evening, CSO Luna warned CSO Elarton of possible trouble.

Within two hours of Chavarria's arrival at Perryville, he was found dead in the laundry room. He had suffered a shattering blow to his left kneecap that would have made it impossible for him to stand, and several blows to the back of his head from a blunt instrument.

Upon discovery of Chavarria's body, the guards ordered a lockdown. A search of the laundry room revealed the murder weapon, an eighteen-inch metal bar with one end wrapped in masking tape, discarded in a trash can. Also found in the trash can was a pair of gray leather gloves, and a knit bag was found inside a still-spinning dryer. The bag had a Department of Corrections (DOC) number and the name "Tommy Contreras" on it. Investigators Vignault, McPheron and Babb proceeded to Contreras' cell, where they seized a pair of shower thongs with stains on them. Tests later revealed that the stains were not blood. There is conflicting testimony as to whether some wet clothing was also seized from Contreras' cell.

The day after the murder, an inmate, Anthony Apodaca, informed DOC investigators that he had information about the murder, but would give details to them only if Nolan Thompson, an investigator from Florence in whom he had previously confided, came to Perryville. Thompson went to Perryville on June 23.

Apodaca related to Thompson that in the early evening of June 21, while lying on the bunk in his cell, Serna entered his room, dropped a length of steel pipe and said, "Well, I'm not going to let something happen to me like David." When Apodaca asked what Serna meant, Serna replied that "Pat" (Chavarria) was at Perryville, and that, "he was going to down Pat before Pat downed him." Serna then said that Pat was in Diablo's (Tommy Contreras') cell. Serna asked for tape, which Apo-

daca gave him; Serna taped one end of the steel bar and put it underneath the bed. Next, Serna asked to borrow gloves. Because Apodaca had none, Apodaca went next door and got gloves. Serna put the gloves on, reached under Apodaca's mattress, retrieved the steel bar and hit it against his hand as if to test the grip of the gloves. Serna indicated that he wanted to kill Chavarria right then; Apodaca tried to dissuade him by telling him that it was "crazy" and that it would create a lot of problems for inmates. Although Apodaca's roommate, Abel Rodriguez, had been momentarily in the room when Serna entered, he left shortly thereafter when Apodaca told him to.

About twenty minutes after the Serna–Apodaca conversation, Apodaca, standing outside his cell, saw "Diablo" (Tommy Contreras), "Joker" (Michael de la Rosa), "Wheelo" (Jerry Contreras, Tommy's brother), and Chavarria emerge from Tommy Contreras' cell. Chavarria and Tommy Contreras walked toward the laundry room. Contreras got on top of a washing machine while Chavarria stood at an angle talking to him.

Apodaca then returned to his cell. Serna was there, but left shortly thereafter with pipe in hand, saying, "Now I can get him." Apodaca could see into the laundry room from outside his cell. Apodaca said that as soon as Serna entered the laundry room, Tommy Contreras ran out "like a jack rabbit." Serna cornered Chavarria and hit him with the steel pipe three or four times.

Serna, who was wearing a grey sweat shirt and pants, cut-off jeans over the sweat pants, and white high-top leather tennis shoes, returned to Apodaca's cell after the attack. Apodaca washed Serna's bloody sweat pants in cold water. Serna removed his shoes and washed them in the toilet; because he could not get all the blood out of the shoestrings, he flushed the shoestrings down the toilet. Having washed the clothes, Serna put on the wet sweat pants and shoes and walked down the stairs.

After the interviews with Apodaca, DOC investigators confiscated a pair of cut-off

jeans, a sweat shirt, and sweat pants and white leather high-top tennis shoes from Serna's cell. Serna's cut-off jeans had a very small smear of type AB blood. The victim's blood type was AB and the blood on the murder weapon and on the gloves found in the laundry room were also of the AB type. Criminalist Susan Narveson testified that only two percent of the Hispanic population have an AB blood type.

Serna's first trial ended in a hung jury. After his second trial, the jury returned a verdict of guilty of first degree murder. Following denial of defendant's motion for new trial, the trial court held a presentence hearing pursuant to A.R.S. § 13–703. The trial court found the existence of two statutory aggravating circumstances: 1) the defendant had previously been convicted of felonies involving the use or threat of violence (A.R.S. § 13–703(F)(2)); and 2) the crime was committed while defendant was in custody of DOC (A.R.S. § 13–703(F)(7)). Finding no mitigating circumstances sufficient to outweigh the aggravating circumstances, the trial court sentenced Serna to death. This appeal followed.

## DISCUSSION

### 1. Preservation of Evidence

Abel Rodriguez, Apodaca's cellmate, was an illegal alien. He was paroled on November 26, 1985, and delivered to the Immigration and Naturalization Service, which deported him to Mexico on December 5, 1985. Before trial, defendant moved to dismiss, alleging a violation of his sixth amendment and due process rights. He argued that Rodriguez was a material witness who was deported before defense counsel could interview him. The trial court denied the motion to dismiss, noting that defense counsel had four months to interview Rodriguez before he was deported and had failed to do so, and also noting that the nature of Rodriguez' testimony was wholly speculative. Defendant argues that the trial court erred in refusing to dismiss the case. We disagree.

The Supreme Court of the United States addressed a similar issue in *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). In that case, the government deported potential witnesses after determining that they possessed no material evidence relevant to the criminal trial. The Supreme Court held:

> [T]he responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution. The mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment. A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense.

458 U.S. at 872–73, 102 S.Ct. at 3449, 73 L.Ed. at 1206.

Defendant argues that because the state failed to interview Rodriguez before the federal government deported him, the state did not and could not make a good faith determination that Rodriguez did not possess material evidence. Although the state concedes that it did not interview Rodriguez prior to deportation, it argues that defendant, through counsel, had ample opportunity to identify and interview Rodriguez before he was deported. The state correctly points out that the identification of Rodriguez to defendant (assuming it was not known to him) was delayed by defendant's overly broad discovery motions. Defendant originally sought the names of all Apodaca's cellmates at all institutions at which he had been confined during the entire period of his lengthy incarceration, and the state objected because this would have covered more than 400 people. After a second discovery motion, the trial court ordered the state to disclose the names of Apodaca's cellmates for the six-month period prior to the murder and the state complied. By that time, Rodriguez had been deported.

While defendant's own actions arguably led to a delay in his identification of Rodriguez, the fact remains that the state has a legal duty to preserve evidence. Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt. *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). Defendant insists that the state has breached this duty and that the breach requires dismissal. We disagree.

■ Here, the state concedes that it failed to make a determination whether Rodriguez was a material witness before the federal government deported him. That is analogous to the situation where the state loses or destroys evidence useful to a defendant. Defendant claims, therefore, that deportation of Rodriguez violated the due process clause of the federal constitution. Recently, the United States Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, ——, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988). Defendant has not made a showing of bad faith on the part of the state in not interviewing Rodriguez prior to his deportation. Therefore, defendant was not denied his constitutional right to due process.

■ We also note that the trial court here gave a *Willits* instruction. *See State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964). The jury was instructed:

If you find that the plaintiff, the state of Arizona, has lost, destroyed, caused to be destroyed or allowed to be destroyed any evidence whose contents or quality are in issue, you may infer that true fact is against their interest.

We have held that a *Willits* instruction adequately protects a defendant's due process rights where the state has destroyed or failed to preserve evidence unless the defendant is prejudiced or the state acted in bad faith. *State v. Tucker*, 157 Ariz. 433, 759 P.2d 579 (1988). There was no showing of prejudice or bad faith in the case before us.

■ Defendant argues alternatively that, regardless of our holding on the issue of the state's failure to interview, he is still entitled to a new trial for an alleged discovery violation concerning disclosure of Rodriguez' address in Mexico. During the testimony of Ron Cherry, a DOC investigator, Cherry stated that the state had a township address for Rodriguez' father in Chihuahua, Mexico. At that point, defense counsel moved for a mistrial, arguing that the state had always claimed that it did not have an address for Rodriguez and that the prosecutor had misled defense counsel to believe Rodriguez was in Sonora, not Chihuahua, Mexico. The trial court held an evidentiary hearing and denied the motion for mistrial. Defendant argues that if he had been provided with Rodriguez' father's address, he could have located Rodriguez.

It is well established that the Due Process Clause of the Fourteenth Amendment requires the state to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment. *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The facts of this case, however, demonstrate that defendant has not been denied his due process rights. First, defendant has made no showing that Rodriguez's testimony would have been favorable to him. Whether Rodriguez would contradict or corroborate Apodaca's testimony remains a matter of pure speculation. Additionally, even giving full weight to Cherry's trial testimony, there is no question of the state's good faith in attempting to locate Rodriguez after his deportation for the purpose of making him available for an interview. The state, through the Mexican Consulate, attempted to arrange for Rodriguez to return to the United States, and thought it had done so. A meeting was scheduled, but Rodriguez failed to show. The Mexican Consulate was not able to reestablish contact with him. Under these circumstances, the trial court did

not abuse its discretion in denying a mistrial.

Finally, with respect to allegedly lost or destroyed evidence, defendant argues that the trial court erred in denying his motion to dismiss based on the "loss" of wet clothing allegedly confiscated from Contreras' cell. Defendant claims that if the state had preserved Contreras' wet clothes, they would have corroborated his theory that Apodaca and Contreras committed the murder and that Contreras had washed his clothes afterwards. Defense counsel pressed this point to the jury in both opening statement and closing argument.

The evidence that "wet clothing" in addition to shower thongs was removed from Contreras' cell is thin at best. Giving the defendant the benefit of the doubt, it may be said that the evidence was in conflict as to whether wet clothing was removed from Contreras' cell. The judge gave a *Willits* instruction to protect defendant's due process rights. The jury heard arguments from the defense and the state on this matter, and, under the *Willits* instruction, could infer the facts against the state if it found that wet clothes had, in fact, been seized and then lost or destroyed. We find no due process violation.

2. Defendant's Claim of Secret Agreements

The state and Apodaca entered into two written agreements. In the first, Apodaca agreed to testify and the state agreed to provide increased protection to him and to advise appropriate courts or boards of his expected cooperation. The first written agreement contained an integration clause reciting that it was the exclusive agreement between the parties. Later, Apodaca and the state entered a second written agreement in which the state agreed not to transfer Apodaca out of Arizona without his consent. Both written agreements were admitted into evidence over defendant's objection.

Defendant vehemently asserted both at trial and in this court that the state had a secret immunity agreement with Apodaca that it failed to disclose. It is firmly established that the state cannot knowingly conceal any leniency agreement entered into with a material witness. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *State v. Holsinger*, 115 Ariz. 89, 563 P.2d 888 (1977). A defendant has the burden of proving the existence of such an agreement by a preponderance of the evidence, and appellate review of the trial court's findings of fact is limited to determining whether those findings are clearly erroneous. *State v. Burr*, 126 Ariz. 338, 339, 615 P.2d 635, 636 (1980); *see also State v. Rhymes*, 129 Ariz. 56, 57, 628 P.2d 939, 940 (1981).

Defendant has offered no evidence of any such secret agreement. Instead, defense counsel extensively cross-examined Apodaca on his motives for testifying and on the alleged existence of other, unwritten agreements between him and the state. Based on this cross-examination, defense counsel argued to the jury that there must have been a secret agreement. The trial court made no findings with respect to any such secret agreement nor was it requested to do so. No evidence before us permits a finding that a secret agreement existed. Lacking any evidence, defendant argues that the mere fact that Apodaca, to this date, has not been charged with a crime is itself sufficient "proof" that a secret agreement exists. Defendant cites no authority for this proposition and we have found none.

Defendant also contends that an erroneous evidentiary ruling by the trial court prevented him from proving the existence of a secret agreement. At defendant's first trial, defendant's investigator, Mary Duran, testified that it was "common knowledge" among inmates that cooperation with DOC results in absolute immunity from prosecution as well as in favorable consideration on reclassification and work furlough matters. Prior to the second trial, the prosecutor filed a motion in limine to preclude this testimony. After a hearing, the court granted the motion. The defen-

dant claims this ruling was error. We disagree.

Duran based her testimony on information she had gleaned from reading a DOC file some six or seven years previously. The file concerned a reduction of sentence for James Bowan. Duran's testimony was clearly hearsay. Defendant did not present the testimony of anyone with first-hand knowledge of the Bowan deal or of any other deal. The hearsay testimony was properly ruled inadmissible.

■ We independently consider whether Rule 406 of the Rules of Evidence provides a basis for the admission of the testimony and conclude it does not. That rule provides that evidence of the routine practice of an organization may be admissible when relevant to prove that the conduct of the organization on a particular occasion was in conformity with the routine practice. However, the conduct must be "semi-automatic and regular." *See State v. Munguia*, 137 Ariz. 69, 72, 668 P.2d 912, 915 (App.1983). Defendant presented no evidence that would qualify as evidence of a routine practice of an organization under Rule 406.

■ In a closely related argument, defendant contends that the state misrepresented the law in its final argument, with the result that the jury was effectively precluded from finding that Apodaca had been granted immunity. In defense counsel's final argument, he, consistent with defendant's theory that Apodaca was the murderer, argued that the state's failure to charge Apodaca in the homicide for two years supported defendant's theory that there must have been a secret immunity agreement. In response to that argument the prosecutor stated in his rebuttal argument:

> Well, he [Apodaca] didn't get charged with a crime. It's been 2 years and Tony Apodaca has never been charged. Mr. Wilkinson [defense counsel] wants to tell you that there is no statute of limitations on first degree murder. No. 2, there is no evidence that Tony Apodaca did anything other than help. Actually all he did was hold the bar while the defendant wrapped tape around it and I'm not sure what you can charge for that. Clearly, not first degree murder, he didn't do anything other than observe and allow the defendant to walk out and commit the crime and unfortunately, that's not illegal.

Defendant made no objection to the prosecutor's argument in the trial court but contends on appeal that it entitles him to a new trial. He argues that the prosecutor misstated the law because, by Apodaca's own testimony, Apodaca aided and abetted Serna by providing him with tape and gloves, keeping watch for him until the victim went to the laundry, and then assisting in washing the blood off Serna's clothes.

Each side is permitted to argue its version of the evidence to the jury. To the extent the prosecutor's argument represents a permissible view of the evidence, defendant cannot be heard to complain. To the extent the argument may be construed as a statement of law to the effect that Apodaca could not legally be charged with any criminal offense under any view of the evidence, it may have been erroneous. The state may not misstate the law to the jury. *State v. Tims*, 143 Ariz. 196, 693 P.2d 333 (1985); *State v. Daymus*, 90 Ariz. 294, 367 P.2d 647 (1961); *United States v. Berry*, 627 F.2d 193 (9th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981). For purposes of this discussion, we will assume that the prosecutor's comments may appropriately be considered a statement that Apodaca could not legitimately be charged with a crime under any version of the evidence, and that such statement was a misstatement of the law.

Had defendant objected at the time, the trial court could easily have cured any misapprehensions any jury member may have had based on the statement. Because there was no such objection, the issue before us is whether the assumed misstatement of law was of such magnitude as to constitute fundamental error necessitating a new trial.

Error is fundamental when it reaches "the foundation of the case or takes from the defendant a right essential to his defense," *State v. Gamble*, 111 Ariz. 25, 26, 523 P.2d 53, 54 (1974), or is an "error of such dimension that it cannot be said it is possible for a defendant to have had a fair trial." *State v. Smith*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977). The error must significantly contribute to the verdict and "the prejudicial nature of the unobjected-to error must be evaluated in light of the entire record." *State v. King*, 158 Ariz. 419, 763 P.2d 239 (1988); *State v. Thomas*, 130 Ariz. 432, 436, 636 P.2d 1214, 1218 (1981).

After reviewing the record, we find that the prosecutor's comment, even under the assumptions we make, did not rise to the level of fundamental error. Defense counsel consistently argued the existence of a secret agreement. The prosecutor's legal opinion on Apodaca's culpability was more than rebutted by defense arguments. The comment was a single statement in the context of a long discourse on lack of evidence of any secret agreements. The jury heard Apodaca's cross-examination on this issue, as well as the testimony of several state officers concerning the issue of immunity. The jury was instructed that the attorneys' arguments were not evidence and that they were bound by the law as given by the judge. Upon these facts, we find no fundamental error.

### 3. Victim's Prior Bad Acts

█ Upon the state's motion and without objection by defendant, the trial court entered a pretrial order excluding any reference to victim Chavarria's prior bad acts. The state's motion argued that evidence of this nature is only admissible in a case where the issue of self-defense is raised, or when the question arises as to whether the deceased was the initial aggressor. *State v. Hicks*, 133 Ariz. 64, 649 P.2d 267 (1982). At the hearing on the state's motion, defense counsel explained that he wanted to show that the victim was despised, and that the "Mexican Mafia" had put a contract out on him. Defense counsel then stated:

Now, my point is as to the specific acts which Mr. Chavarria may have committed on the street, we have *no objection* to those specific acts being excluded. *That's irrelevant,* but when it touches upon the fact that he was hated, that he had done things on the street which caused the contract to be out on him, to deny that to this jury is to deny a fair trial.

R.T. at 6, 10/22/86 (emphasis supplied).

The prosecutor told the trial court that he had no objection to defense counsel's attempting to show that many people disliked the victim; his only objection was to the use of specific prior bad acts because they were irrelevant. Defense counsel having agreed that specific prior bad acts were irrelevant, the trial court granted the state's motion to exclude reference to them.

On appeal, defendant shifts positions. He concedes that evidence of victim's prior bad acts is inadmissible if the purpose is merely to prove that the victim was a bad person, but argues that such acts should be admissible to show that the victim was adept at self-defense. Defendant now argues, for the first time, that it is unlikely that a single person could have killed the victim, and that the lack of "defense blows" on the victim is evidence that two men restrained him as a third clubbed him to death. This evidentiary theory is advanced for the first time on appeal and, therefore, will not be considered by this court. Because defendant conceded the excludability of this evidence at trial, his objection is now waived. *Cf. State v. Neal*, 143 Ariz. 93, 100, 692 P.2d 272, 279 (1984) (evidence admitted over objection at trial cannot be objected to on new grounds on appeal); *State v. Zuck*, 134 Ariz. 509, 513, 658 P.2d 162, 166 (1982) (evidence objected to on one ground and admitted, waives other grounds for objection not specified).

### 4. Right to Counsel

█ Defendant argues that the state interfered with his right to assistance of counsel by effectively forcing his first appointed counsel to withdraw. Prior to trial,

the state filed a motion for determination of counsel. Ultimately, at the direction of the trial court, the prosecutor prepared contempt charges against the first appointed defense counsel. Before being charged with contempt, defense counsel, without objection from defendant, voluntarily withdrew from the case and a new defense counsel was appointed. Although defendant made no complaint in the trial court, he argues here that the state has interfered with his right to counsel.

We have, on several occasions, remarked that motions to disqualify an opposing party's attorney are disfavored and are viewed with suspicion. *Gomez v. Superior Court,* 149 Ariz. 223, 226, 717 P.2d 902, 905 (1986); *Alexander v. Superior Court,* 141 Ariz. 157, 161, 685 P.2d 1309, 1313 (1984); *see also Cottonwood Estates, Inc. v. Paradise Builders, Inc.,* 128 Ariz. 99, 105, 624 P.2d 296, 302 (1981). We have also noted that we will not tolerate impermissible interferences with the right to the assistance of counsel, and that we deplore any governmental action that intrudes on the attorney-client relationship. *State v. Warner,* 150 Ariz. 123, 722 P.2d 291 (1986), *appeal after remand,* 159 Ariz. 46, 764 P.2d 1105 (1988); *see State v. Madrid,* 105 Ariz. 534, 468 P.2d 561 (1970). In cases involving disqualification of counsel, we will carefully review the record for any denial of defendant's sixth amendment rights.

On December 20, 1985, first appointed defense counsel, at an in-chambers hearing, asked the trial court for the Department of Corrections' master file on Anthony Apodaca, John Serna, and Patrick Chavarria. The trial court ordered disclosure of the files only to defense counsel and his investigator Mary Duran. Defense counsel was specifically ordered not to communicate the contents of the files to defendant without prior leave of court. Defense counsel also sought disclosure of the contents of an interview conducted by DOC investigators Cherry and Stewart with Tommy Contreras. The prosecutor protested that Contreras would not testify at trial even if granted immunity, and that Contreras' life would be in danger if the contents of the interview were ever revealed to defendant. The trial court ordered that investigator Cherry reduce the contents of the Contreras interview to a report, and that the report be disclosed to defense counsel who was ordered not to reveal its contents to defendant without prior leave of court.

On January 9, 1986, defense counsel interviewed Tom Stewart and inquired about the Contreras interview. The prosecutor advised defense counsel not to reveal the contents of Stewart's interview to defendant. Defense counsel, however, took the position that the Stewart interview was not within the trial court's order of December 20, 1985.

On January 22, 1986, defense counsel interviewed Ron Cherry. Again, there was disagreement between defense counsel and the prosecutor over the scope of the trial court's December 20, 1985, order. Defense counsel argued that the court order covered the master file but not the Ron Cherry interview then in progress, or Cherry's report on the Contreras interview. An informal conference in Judge Coulter's chambers was held to resolve this dispute.

On March 6, 1986, defense counsel filed a discovery motion. At the hearing on the motion on March 11, 1986, the prosecutor told the judge that defense counsel had already disclosed the contents of the Contreras interview to defendant. The prosecutor advised the court that defendant had told inmate Tash that defense counsel and his investigator had revealed to him (i.e., defendant Serna) the contents of the Contreras interview. Defense counsel denied that he had violated the court's order and insisted that the court order covered only the master file and Ron Cherry's report and not Stewart's interview.

The next day, March 12, 1986, the prosecutor filed a motion for determination of counsel and for reappointment of investigator. At this hearing, the prosecutor stated that he had a sworn statement from inmate Tash that led the prosecutor to believe that defense counsel had violated the court's order. Following this hearing, defense counsel withdrew on March 17, 1986, with court permission and without objection by

defendant. On March 19, Judge Coulter, to whom the case was then assigned, entered an order reciting that it appeared to him that defense counsel might have violated the court order and ordering the prosecutor to prepare and submit a contempt petition based on the apparent violation. The prosecutor complied with the order, the contempt citation was prepared, issued by Judge Coulter and set for trial before Judge Thomas O'Toole.

At the conclusion of the state's case at the contempt trial, the defense moved for a judgment of acquittal for lack of substantial evidence. Judge O'Toole denied the motion, stating that sufficient and substantial evidence precluded the granting of the motion. At the conclusion of the hearing, however, Judge O'Toole ruled that he could not find beyond a reasonable doubt that defense counsel had knowingly and willfully violated the court order when he discussed the Contreras interview with the defendant.

We chronicle the foregoing facts because they demonstrate that no evidence exists whatsoever to support defendant's present contention that the prosecutor filed the motion for determination of counsel simply to "elbow" defense counsel out of the litigation. In fact, it was Judge Coulter who ordered the prosecutor to present an order to show cause concerning contempt. Furthermore, although Judge O'Toole did not find a knowing violation of the court's order, he did find that defense counsel had disclosed the content of Contreras' interview to Serna. Under these facts, defendant has clearly failed to show that the state interfered with his right to counsel or that he was prejudiced in any manner by the change of counsel.

5. The Death Penalty

■ In every death penalty case, we independently review the record to determine if the imposition of the death penalty is appropriate. We examine all facts and re-weigh the aggravating and mitigating circumstances when we find both to be present. *State v. Rossi,* 146 Ariz. 359, 365, 706 P.2d 371, 377 (1985), *appeal after re-*

*mand,* 154 Ariz. 245, 741 P.2d 1223 (1987); *State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

The trial court found that the state had proven beyond a reasonable doubt that Serna was previously convicted of two felonies involving the use or threat of violence on another person within the meaning of A.R.S. § 13–703(F)(2). We have held that the statutory definition of the earlier felony governs and determines whether it falls within A.R.S. § 13–703(F)(2). *State v. Romanosky,* 162 Ariz. 217, 227, 782 P.2d 693, 703 (1989); *State v. Gillies,* 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983). The trial judge here determined that both prior felonies fell within A.R.S. § 13–703(F)(2). Although these findings are not challenged on appeal, we have independently reviewed them and find no error. The trial court also found a second statutory aggravating circumstance was present in that the defendant committed the present offense while in the custody of DOC. A.R.S. § 13–703(F)(7). This finding is indisputably mandated by the evidence.

The trial court found that defendant had established no statutory or non-statutory mitigating circumstances sufficiently substantial to call for leniency. Defendant offered evidence in mitigation to the effect that he had been a religious person since 1983 and that he had ministered to other inmates. He had also contributed to chapel programs in prison. At sentencing, he continued to profess his innocence. The trial court rejected these reasons as being sufficiently mitigating to grant leniency. After independently reviewing the record, we concur with the trial court. *See, e.g., State v. Poland,* 144 Ariz. 388, 698 P.2d 183 (1985), *aff'd,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) (fact that defendant was a model prisoner was not a mitigating factor sufficiently substantial to call for leniency).

Although not mandated by the United States Constitution, in addition to making an independent determination of the aggravating and mitigating circumstances, we conduct a proportionality review. *State v.*

*McCall,* 160 Ariz. 119, 770 P.2d 1165 (1989), *petition for cert. filed,* (U.S. July 17, 1989) (No. 89–5133). Having reviewed other cases in which the death penalty was imposed, we find that defendant's sentence is not excessive or disproportionate. *State v. Vickers,* 159 Ariz. 532, 768 P.2d 1177 (1989), *petition for cert. filed,* (U.S. June 20, 1989) (No. 88–7629); *State v. Evans,* 124 Ariz. 526, 606 P.2d 16, *cert. denied,* 449 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d 119 (1980). *See also Murphy v. State,* 248 Ark. 794, 454 S.W.2d 302 (1970); *State v. Parkus,* 753 S.W.2d 881 (Mo.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 248, 102 L.Ed.2d 237 (1988).

█ Defendant also argues in this court (although not in the trial court) that because Apodaca was not charged, defendant should be spared the death penalty. Under the circumstances of this case, we disagree. We have previously stated, "the disposition of other persons involved in the crime is an important factor in determining the proportionality of a capital sentence ..." *State v. Lambright,* 138 Ariz. 63, 76, 673 P.2d 1, 14 (1983), *cert. denied,* 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). In weighing all the relevant circumstances, we note that Apodaca, if culpable at all, is far less culpable than defendant. At most, the evidence would suggest Apodaca played the role of a facilitator or abettor. It was defendant who planned and committed the murder. In cases of prison murders, prosecution would frequently be impossible without the state entering into an agreement with one or more inmates.

Defendant also claims that his death sentence is improper because of the state's alleged interference with his right to counsel, and because the state destroyed or lost evidence. We have previously rejected these arguments in connection with defendant's attack on his conviction. Finally, defendant argues, without support in the evidence, that he was under unusual duress when the murder was committed. We find no merit in this argument.

6. Right to Jury Sentencing

█ Defendant asserts that the court-imposed death penalty violates article 2,

section 23 of the Arizona Constitution, which guarantees the right to trial by jury. We have reviewed this claim in other cases and held that neither the federal nor Arizona constitutions require jury sentencing in death penalty cases. *State v. Roscoe,* 145 Ariz. 212, 226, 700 P.2d 1312, 1326 (1984), *cert. denied,* 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985); *State v. Bracy,* 145 Ariz. 520, 536, 703 P.2d 464, 480 (1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). In the recent case of *Vickers,* 159 Ariz. at 543, 768 P.2d at 1188, we adhered to our earlier views on this issue while recognizing that the Ninth Circuit has expressed a contrary view in *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988), *petition for cert. filed,* (U.S. Mar. 20, 1989) (No. 88–1553).

DISPOSITION

Defendant presents no reversible error and our independent review pursuant to A.R.S. § 13–4035 discloses none. Our independent review of the evidence satisfies us that the death penalty was appropriately imposed in this case. The conviction and sentence are affirmed.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and CORCORAN, JJ., concur.