66 P.3d 50

STATE of Arizona, Appellee,

v.

Sherman Lee RUTLEDGE, Appellant.

No. CR–01–0129–AP.

Supreme Court of Arizona,
En Banc.

April 7, 2003.

Janet A. Napolitano, Former Attorney General, Terry Goddard, Attorney General by Kent E. Cattani, Chief Counsel, Capital

Litigation Section and John Pressley Todd, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Robert W. Doyle, Phoenix, Attorney for Appellant.

## OPINION

RYAN, Justice.

¶ 1 Appellant, Sherman Rutledge, was convicted of armed robbery, first degree murder of Ryan Harris and attempted second degree murder of Chase Clayton for events that occurred on May 13, 1997. Rutledge was sentenced to the maximum of twenty-one years for armed robbery and twenty-one years for attempted murder. He was sentenced to death for the murder. Direct appeal to this court is mandatory when the trial court imposes a sentence of death. Ariz. R.Crim. P. 26.15 and 31.2(b). We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13–4031 (2001).

### I.

¶ 2 On the night of May 12, 1997, Chase and Ryan celebrated their twenty-first birthdays.[1] Chase picked up Ryan in a new red Ford Explorer between 9:30 and 10:00 p.m. They went bar hopping until 1:00 a.m. After last call, Chase and Ryan got back into the Explorer and headed toward a friend's apartment at 40th Street and Camelback Road.

¶ 3 Meanwhile, Appellant Rutledge met Ruben Bustos, Jason Ellis and three teenage girls, who were hanging out on the canal bank near the intersection of 40th Street and Camelback Road. Chase and Ryan encountered Rutledge and the group when they stopped for a red light at the intersection. Chase offered the group a ride, after which the entire group went to the 40th Street and Camelback Road apartment. The group left the apartment on two occasions, once to drop off the girls and pick up Rutledge's brother,

Jermaine, and a second time to buy drugs at Madison Park located at 16th Street and Campbell.

¶ 4 When the group reached Madison Park, Rutledge got out of the vehicle and pointed a gun at Chase. He pulled the trigger but the gun did not fire. Chase tried to drive away but was hit over the head with a beer bottle by Jermaine. Jermaine then pulled a knife and while he and Chase were fighting for it, Rutledge opened the driver's side front door and pulled Chase out of the Explorer. Chase then said, "If you want it, you can have it," after which he ran from the park and climbed over a chain link fence to reach safety. Rutledge fired three or four shots at Chase as he ran, hitting him once in the shoulder.

¶ 5 At some point, Rutledge shot Ryan and pulled him from the vehicle. The bullet passed through Ryan's pulmonary artery and lodged in his left lung causing him to bleed to death. His body was found approximately 100 yards from where the Explorer had been parked.

¶ 6 After shooting Ryan, Rutledge got back into the Explorer and Jermaine drove away. Rutledge told Ruben and Jason that if either of them told anyone, he would "put a bullet in [them] because he still had one left in his gun." Jermaine backed up the threat, stating, "[a]nd I have a knife." Later that morning, the Explorer was found burning behind a car dealership in Mesa. It had been completely destroyed by fire.

¶ 7 By the time the Explorer was found burning, police already suspected Rutledge and Jermaine of the crimes. By late morning on May 13, 1997, police had located Rutledge's apartment at 16th Street and Campbell.

¶ 8 A search of Rutledge's apartment revealed several pieces of evidence: a piece of paper Ruben and Jason used as an address book,[2] a knife similar to the one used by

---

1. We view the evidence presented at trial in a light most favorable to sustaining the verdicts. *State v. Gallegos,* 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994) (citing *State v. Atwood,* 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992)).

2. Rutledge had written his nickname, "Sherm," and telephone numbers on this "address book" for Jason and Ruben, but demanded that they give it back to him after the crimes were committed.

Jermaine when he attacked Chase, and a semi-automatic .25 caliber pistol, which was located in Rutledge's mother's locked safe. Fingerprints on the knife matched Jermaine's. An examination confirmed that the pistol had been fired. The bullet removed from Ryan was consistent with a bullet fired from the .25 caliber pistol, but lacked sufficient markings to positively identify the seized pistol as the gun from which the bullet was fired. A shell casing at the scene was also consistent with having been fired from a .25 caliber pistol.

¶ 9 Shortly after midnight on May 14, 1997, two Mesa police officers encountered Rutledge and Jermaine walking in the Fiesta Mall parking lot in Mesa. They were arrested and transported to the Phoenix Police Department.

¶ 10 Rutledge was subsequently interviewed by Detective Lewis of the Phoenix Police Department. During the videotaped interview, Rutledge denied having any involvement with the crimes and even denied being picked up by Chase and Ryan in a red Ford Explorer. When asked what he was doing at the time of the crimes, Rutledge answered that he was "with some females," "getting some pussy," and that he "wasn't out popping nobody." Rutledge refused to give Detective Lewis the names of the "females," claiming "they was [sic] nobody special." Rutledge maintained that he was not involved in the crimes and that he had not seen Jermaine in days.

¶ 11 At trial, Chase and Ruben testified that Rutledge committed the crimes. Rutledge defended by claiming misidentification-that he was not present at the park when Chase and Ryan were shot. He based his defense on Jason's trial testimony that an unknown black male committed the crimes.

¶ 12 But in a videotaped interview conducted by the police shortly after the crimes, Jason had identified Rutledge as the person who committed the crimes. At trial, Jason testified that he named Rutledge as the shooter because he was intoxicated and confused during the videotaped interview and was just telling the police what they wanted to hear. The trial court admitted the videotape to impeach Jason's testimony.

¶ 13 The jury returned guilty verdicts on all counts. Following the verdict, a mitigation and aggravation hearing was held. The trial court found one aggravating factor beyond a reasonable doubt-that Rutledge committed the murder in expectation of pecuniary gain based on the theft of the Explorer. A.R.S. § 13–703(F)(5). The trial judge found that no mitigating circumstances had been proven by a preponderance of the evidence. He therefore sentenced Rutledge to death.

## II.

### A.

¶ 14 Rutledge argues that he was denied a fair trial because the trial court did not comply with Arizona Rules of Evidence 613(b), which requires that Jason's prior statement be inconsistent before admitting into evidence his videotaped statement to police. Shortly after the verdicts, he filed a motion for a new trial, claiming that the trial court's admission of Jason's videotaped interview with police was an abuse of discretion and denied him his rights to a fair trial and to present a defense under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as Article 2, Section 24, of the Arizona Constitution.

¶ 15 We review whether the trial court erred in denying Rutledge's motion for a new trial for abuse of discretion, *State v. Hoskins*, 199 Ariz. 127, 142, ¶ 53, 14 P.3d 997, 1012 (2000), and we review the trial court's determination of the relevancy and admissibility of evidence for abuse of discretion. *State v. Amaya–Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990).

¶ 16 Arizona Rule of Evidence 613(b) provides that extrinsic evidence of a prior inconsistent statement is not admissible unless the witness is afforded an opportunity to explain or deny making the statement, and the opposing party is afforded an opportunity to interrogate the witness. "Either or both of these requirements can be dispensed with only if 'justice so requires.'" *State v. Emery*, 131 Ariz. 493, 504, 642 P.2d 838, 849 (1982) (referring to Ariz. R. Evid. 613(b)).

However, the rule does not specifically address the use of extrinsic evidence of prior inconsistent statements when the witness admits the prior inconsistencies.

¶ 17 According to Rutledge, the only material inconsistency between the videotaped interview and Jason's testimony is that Jason lied to the police in the videotape when he said Rutledge was present at Madison Park when the crimes took place. Jason admitted to that lie at trial. Because most of the other statements were either consistent or already explained by Jason, the interests of justice did not require admission of the entire fifty-five minute videotape. Therefore, according to Rutledge, the videotaped interview was inadmissible.

¶ 18 The State argues that once Jason claimed he was intoxicated when he made the statements and intimidated into making them, he placed the credibility of his prior statements at issue. The trial court agreed, stating that introduction of the videotape went to "whether or not the defendant was under the influence of something, [or] whether he was operating under some kind of duress or threats." Therefore, the trial court denied Rutledge's motion for a new trial and held that under Rule 613(b) the interests of justice required admission of the videotape.

¶ 19 In *State v. Woods*, we acknowledged that the prevailing view is that extrinsic evidence of an inconsistent statement is inadmissible when the witness unequivocally admits the inconsistencies.[3] 141 Ariz. 446, 452, 687 P.2d 1201, 1207 (1984). However, we specifically declined to follow the majority rule and held that the better rule is that "extrinsic proof of an admitted inconsistent statement is in the discretion of the trial court." *Id.* at 453, 687 P.2d at 1208. Such discretion is necessary because situations occur in which prior inconsistent statements have "substantive use and where the jury must decide which of two inconsistent statements is true."[4] *Id.* In those situations, admission of extrinsic evidence of the statement may be "important for the jury to hear the tone of voice of the witness on the tape ... or look at the film and judge the demeanor of the witness." *Id.*

¶ 20 In this case, Jason testified at trial that Rutledge was not at the scene of the crimes. He claimed that an unidentified black male committed the crimes, but that he could not remember any details of the alleged shooter other than that he was taller and skinnier than Rutledge. Jason testified that he lied during the police interviews, but not during his trial testimony. He stated

3. *See, e.g., Ford v. State,* 296 Ark. 8, 753 S.W.2d 258, 263 (1988); *Roberts v. State,* 712 N.E.2d 23, 32 (Ind.Ct.App.1999); *State v. Johnson,* 10 Ohio App.3d 14, 460 N.E.2d 625, 630 (1983); *McCormick on Evidence* § 37, at 79, 79 80 n. 10 (E. Cleary 3d ed.1984) (stating that prevailing view is to prohibit admission of extrinsic evidence of a prior inconsistent statement once witness has unequivocally admitted the inconsistency, but noting the liberal construction of Rule 613 should be construed to allow judges discretion to admit prior inconsistent statements even when witness admits to inconsistencies). *But see United States v. Lashmett,* 965 F.2d 179, 182 (7th Cir.1992)(holding prior inconsistent statements are admissible even though the witness admits making the prior inconsistent statement); *United States v. Browne,* 313 F.2d 197, 199 (2nd Cir. 1963); *People v. Williams,* 22 Ill.2d 498, 177 N.E.2d 100, 103 (1961); 3A *Wigmore on Evidence* § 1037 (J. Chadbourn rev. ed.1970) (arguing better rule is that even when witness admits prior inconsistent statement extrinsic evidence of that prior statement should still be admissible).

4. In *Woods,* we cited with approval *Bentley v. Alaska,* 397 P.2d 976, 978 (Alaska 1965), which held that the trial court erred in not admitting a

taped conversation that was inconsistent with the witness's later testimony. 141 Ariz. at 451, 687 P.2d at 1206. At trial, the witness admitted making prior inconsistent statements and the court excluded a recording of the prior statements on the basis that the admissions impeached the witness, and admission of the tape would be "pointless." *Bentley,* 397 P.2d at 977. The Alaska Supreme Court held that the defendant was entitled to have the recording considered by the jury because it "would have best informed the jury as to the recording's impeaching weight and significance." *Id.* at 978. This court pointed out in *Woods* that the taped statement in *Bentley* had substantive use on the key element of whether the defendant actually stabbed the victim. 141 Ariz. at 451, 687 P.2d at 1206. "Which story the jury believed-the one on tape or the one given at trial-had substantive value to establish the guilt or innocence of the defendant." *Id.* But in *Woods,* whether the jury believed the witness's original statement or the trial version "was collateral to a determination of defendant's guilt or innocence." *Id.*

that he did not change his account of what happened out of fear of Rutledge, but did admit concern about being known as a jail house snitch. He also claimed that he was intoxicated and confused during the interview and that he was intimidated by the police.

¶ 21 Although Jason testified he could not remember any details about the alleged unknown shooter, the videotaped interview showed that he had a clear recollection of many details of the evening of the murder. For example, Jason remembered details such as smoking two cigarettes while Rutledge was in his apartment getting Jermaine, the color of Jermaine's jersey, and the fact that Chase wore a hat.

¶ 22 Jason also testified at trial that he gave Rutledge his "address book" containing Rutledge's nickname and telephone numbers and forgot to get it back from him. However, in the videotaped interview, Jason twice stated that as the group left the park, Rutledge made him give back the "address book." Jason further testified that the only gun he saw that night was a small .25 caliber pistol belonging to Ruben. That gun was similar, but not identical, to the gun presented at trial. In the videotaped interview, however, he stated that Rutledge had a gun and that Rutledge shot the gun.

¶ 23 In the videotaped interview, Jason also stated that when the group went to Rutledge's apartment, Rutledge went into the apartment and returned with his brother after about twenty minutes. Conversely, at trial he testified that Rutledge did not return. Rather, Jermaine and another black male came out. Jason's testimony at trial that Rutledge never threatened him is also inconsistent with statements made during the videotaped interview. Thus, contrary to Rutledge's argument, there are several inconsistencies between Jason's trial testimony and the videotaped interview.

¶ 24 As in *Woods,* Jason's statements had substantive value. Jason told the court and the jury that he lied to the police because he was scared, had been threatened, and was intoxicated. Admission of the entire videotape allowed the jurors to assess Jason's demeanor and credibility and helped them decide which of Jason's accounts to believe.

¶ 25 Under these circumstances, we find no violation of Rule 613(b). The interests of justice required admission of the entire videotape. Therefore, the trial judge did not abuse his discretion by admitting the videotaped interview of Jason.

### B.

¶ 26 Rutledge claims that the prosecutor committed misconduct during his closing argument by commenting on his failure to testify. The Fifth Amendment of the United States Constitution, Article 2, Section 10, of the Arizona Constitution, and A.R.S. section 13–117(B) prohibit any comment, direct or indirect, by a prosecutor about the failure of a defendant to testify. *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *State v. Ikirt,* 160 Ariz. 113, 118, 770 P.2d 1159, 1164 (1987) (citing *State v. Cannon,* 118 Ariz. 273, 274, 576 P.2d 132, 133 (1978)); *State v. Schrock,* 149 Ariz. 433, 438, 719 P.2d 1049, 1054 (1986).

¶ 27 In his closing argument, the prosecutor questioned why Rutledge had not been more forthcoming in his videotaped interview with Detective Lewis. Specifically, the prosecutor stated the following:

> Rutledge admits to having been picked up in Mesa. He has been visiting some girls, didn't want to give them names. Now, if he had been visiting some women during this time period that could provide an alibi for him, *why wouldn't he want to give those names to this detective?*

Rutledge objected that the emphasized comment "shifted the burden of proof" from the State to him. The trial court overruled the objection without comment.

¶ 28 On appeal, Rutledge argues that the emphasized comment was "expressly directed at what [Rutledge] did not say to the detective," and led "directly to the prohibited inference: what [Rutledge] did not say to the jury." Because he did not give Detective Lewis the names of the girls during the interview, Rutledge claims "the jury was led to speculate why [he] had not taken the stand and told them the witnesses' names now."

This, according to Rutledge, violated his Fifth Amendment rights, and violated Article 2, Section 10 of the Arizona Constitution and A.R.S. section 13–117(B).

¶ 29 The State counters that because Rutledge did not raise the specific objection below that he assigns as error here, the issue is waived and can be reviewed only for fundamental error. Rutledge argues that "shifting the burden" was a proper objection to preserve the issue of prosecutorial misconduct on appeal. We conclude that Rutledge failed to make a timely objection stating the specific ground for objection that he now raises.

¶ 30 "The purpose of an objection is to permit the trial court to rectify possible error, and to enable the opposition to obviate the objection if possible." *State v. Hoffman*, 78 Ariz. 319, 325, 279 P.2d 898, 901 (1955) (citation omitted). The objection "shifting the burden" did not adequately raise the claim of prosecutorial misconduct in the trial court. Therefore, we hold that the objection, "shifting the burden," did not preserve the issue of prosecutorial misconduct. Accordingly, any error is reviewed for fundamental error. *See State v. Hughes*, 193 Ariz. 72, 85, ¶ 58, 969 P.2d 1184, 1197 (1998); *State v. Hyde*, 186 Ariz. 252, 272, 921 P.2d 655, 675 (1996); *State v. Cornell*, 179 Ariz. 314, 329, 878 P.2d 1352, 1367 (1994).

¶ 31 Rutledge contends that the prosecutor's comment constituted fundamental error. He argues that, taken in context, the prosecutor's comment called the jury's attention to Rutledge's decision to not testify and this resulted in fundamental error.

¶ 32 "Fundamental error is error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that defendant could not possibly have received a fair trial." *Hughes*, 193 Ariz. at

86, ¶ 62, 969 P.2d at 1198 (internal quotations and citations omitted). Fundamental error is clear, egregious, and of such dimension that it denied the defendant a fair trial. *Id.*; *State v. Gendron*, 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991). Although an improper comment on a defendant's failure to testify can be harmless error,[5] in many cases it is fundamental error.[6]

¶ 33 Whether a prosecutor's comment is improper depends upon the context in which it was made and whether the jury would naturally and necessarily perceive it to be a comment on the defendant's failure to testify. *Schrock*, 149 Ariz. at 438, 719 P.2d at 1054. We must look to the entire record and to the totality of the circumstances. *See Hughes*, 193 Ariz. at 86, ¶ 62, 969 P.2d at 1198 (holding that the cumulative effect of numerous instances of prosecutorial misconduct, including prosecutor's comments regarding the defendant's failure to testify, was fundamental error).

¶ 34 In *Schrock*, the defendant gave a taped statement to police immediately following his arrest. 149 Ariz. at 438, 719 P.2d at 1054. The defendant also noticed an alibi defense, which was not developed at trial. *Id.*

¶ 35 With respect to the taped statement, the prosecutor in *Schrock* stated the following in his closing argument:

And [the taped statement] shows he lied on another occasion. If the State-the people of the State of Arizona brought in a witness, put him in this chair, he made a statement like this and the defense attorney proved he lied to you on significant details, you wouldn't listen to him.

*Id.* We found that this statement was "simply a comment highlighting that defendant's prior statement was not believable." *Id.* at 439, 719 P.2d at 1055.

---

5. *See State v. Guerra*, 161 Ariz. 289, 297, 778 P.2d 1185, 1193 (1989)(holding that prosecutor's comment on defendant's silence on cross examination was harmless because it did not contribute to the verdict, as defendant admitted to the crime).

6. *State v. Smith*, 101 Ariz. 407, 410, 420 P.2d 278, 281 (1966); *see also State v. Arredondo*, 111 Ariz. 141, 143, 526 P.2d 163, 165 (1974)(stating that comment on defendant's failure to testify is *normally* fundamental error); *State v. Rhodes*, 110 Ariz. 237, 238, 517 P.2d 507, 508 (1973)(holding that direct comment on defendant's failure to take the witness stand is fundamental error whether the comment was accidental or intentional).

¶ 36 With respect to Schrock's alibi defense, the prosecutor stated that the defendant's story did not "make sense" and that he therefore had no alibi for the time when the crimes occurred. *Id.* at 438, 719 P.2d at 1054. We noted that the prosecutor's emphasis on the lack of an alibi could indicate that the defendant failed to take the stand and tell the jury where he was when the crimes were committed. *Id.* at 439, 719 P.2d at 1055. Because the defendant put forth an alibi defense, however undeveloped, we found the prosecutor's comment a "questionable" but "valid comment on evidence that defendant could have but did not present through the testimony of others." *Id.* Thus, taken in context, the statements did not impermissibly imply that the defendant did not take the stand and testify as to what he was doing during the time of the crime. *Id.*

¶ 37 Here, the prosecutor said the following: "Now keep in mind, folks, that this defendant in this interview with Detective Lewis ... there are some very important things that he says in this interview and that he doesn't say." According to the State, the prosecutor's remarks did not direct the jury's attention to something they were not supposed to consider. We agree that based on the context of the statement, there was no fundamental error.

¶ 38 The prosecutor clearly referred to Rutledge's failure in the videotaped interview to name the alibi witnesses for Detective Lewis. The prosecutor specifically referred to the videotaped interview and did not refer to Rutledge's decision to not testify. Thus, taken in context, the jury would not naturally and necessarily perceive the prosecutor's remark as a comment on Rutledge's failure to testify. There was no fundamental error.

### C.

¶ 39 Rutledge argues that the jury instruction given at trial on accomplice liability and its relationship to the defense of alibi was erroneous in light of our decision in *State v. Phillips,* 202 Ariz. 427, 46 P.3d 1048 (2002).[7] In *Phillips,* we construed A.R.S. section 13–303(A)(3)[8] to impose criminal liability on an accomplice defendant only for those particular offenses that a "defendant intended to aid or aided another in planning or committing." *Id.* at 436, ¶ 37, 46 P.3d at 1057. We held that a defendant cannot be convicted of premeditated murder, a specific intent crime, when the state proves only that a defendant acted as an accomplice to another felony committed at the time of the murder. *Id.* at 437, ¶ 41, 46 P.3d at 1058.

¶ 40 Rutledge was convicted of first degree felony murder, not of premeditated murder. The evidence also showed that Rutledge himself committed the crimes. Rutledge does not fit within the definition of an "accomplice." Therefore, *Phillips* does not apply to this case.

### III.

### A.

¶ 41 In *Ring v. Arizona,* 536 U.S. 584, 609, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002) (*Ring II*), the United States Supreme Court held that the portion of A.R.S. section 13–703 that allowed judges to find facts that lead to the aggravation of a defendant's sentence was unconstitutional. The Court declared that "[c]apital defendants, no less than non-capital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 588,

---

**7.** The rule announced in *Phillips* applies retroactively to cases not yet final in the state and federal court systems. *State v. Slemmer,* 170 Ariz. 174, 180, 823 P.2d 41, 47 (1991) (citing *Griffith v. Kentucky,* 479 U.S. 314, 320–22, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)).

**8.** Section 13–303(A)(3) reads: "A person is criminally accountable for the conduct of another if ... [t]he person is an accomplice of such other person in the commission of an offense."
An accomplice is defined as

[A] person ... who with the intent to promote or facilitate the commission of an offense:
1. Solicits or commands another person to commit the offense; or
2. Aids, counsels, agrees to aid or attempts to aid another person in planning or committing the offense.
3. Provides means or opportunity to another person to commit the offense.
A.R.S § 13–301.

122 S.Ct. at 2432. The Court reversed our decision in *State v. Ring*, 200 Ariz. 267, 25 P.3d 1139 (2001) (*Ring I*), and remanded for further proceedings consistent with its decision. *Ring II*, 536 U.S. at 609, 122 S.Ct. at 2443. Following the *Ring II* decision, we consolidated all death penalty cases in which this Court had not yet issued a direct appeal mandate, including Rutledge's, and ruled that we would order supplemental briefing on sentencing issues affected by *Ring II* after issuance of our decision in *State v. Ring*, No. CR–97–0428 AP, 65 P.3d 915, 2003 WL 1772032 (Ariz. Apr.3, 2003) ("*Ring III*"). Because *Ring III* has now been issued, by separate order, we direct the parties to submit supplemental briefing in accordance with that opinion. We will address sentencing issues in a supplemental opinion.

## B.

¶ 42 Rutledge raises the following issues not affected by *Ring II* to avoid procedural default. These issues have been previously addressed by this court and rejected. The issues include:

1. The death penalty is *per se* cruel and unusual punishment. Rejected in *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992); *State v. Gillies*, 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983); *see also Gregg v. Georgia*, 428 U.S. 153, 186–87[, 96 S.Ct. 2909, 49 L.Ed.2d 859] (1976).

2. Execution by lethal injection is cruel and unusual punishment. Held constitutional in *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1994).

3. Arizona's death penalty statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. Rejected in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996); *State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995); *see also Walton v. Arizona*, 497 U.S. 639, 648[, 110 S.Ct. 3047, 111 L.Ed.2d 511] (1990) *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584[, 122 S.Ct. 2428, 153 L.Ed.2d 556] (2002).

4. Arizona's death penalty statute unconstitutionally requires defendants to prove that their lives should be spared. Rejected in *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988), *aff'd by Arizona v. Fulminante*, 499 U.S. 279[, 111 S.Ct. 1246, 113 L.Ed.2d 302] (1991).

5. Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. Rejected in *State v. Lopez*, 175 Ariz. 407, 414–15, 857 P.2d 1261, 1268–69 (1993); *see also* A.R.S. § 13–703(G) (mandating that courts consider "*any* aspect of defendant's character, propensities or record and any of the circumstances of the offense as mitigating evidence") (emphasis added).

6. Arizona's death penalty statute is unconstitutional because there are no statutory standards for weighing. Rejected in *State v. Gulbrandson*, 184 Ariz. 46, 72, 906 P.2d 579, 605 (1995).

7. Arizona's death penalty statute is constitutionally defective because it fails to require the state to prove that death is appropriate. Rejected in *Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605.

8. The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards. Rejected in *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

9. Arizona's death penalty has been applied arbitrarily and irrationally and in a discriminatory manner against impoverished black males whose victims have been Caucasian. Rejected in *State v. West*, 176 Ariz. 432, 455, 862 P.2d 192, 215 (1993), *overruled on other grounds by State v. Rodriguez*, 192 Ariz. 58, 961 P.2d 1006 (1998).

10. The Constitution requires a proportionality review of a defendant's death sentence. Rejected in *Salazar*, 173 Ariz. at 416, 844 P.2d at 583; *State v. Serna*, 163 Ariz. 260, 269–70, 787 P.2d 1056, 1065–66 (1990).

11. There is no meaningful distinction between capital and non-capital cases. Rejected in *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991) (finding that Arizona statute sufficiently narrows the class of defendants who are death eligible).

## IV.

¶ 43 For the reasons discussed, the convictions are affirmed. The sentences for armed robbery and attempted murder are affirmed. The sentence on the murder conviction will be addressed in a supplemental opinion.

CONCURRING: CHARLES E. JONES, Chief Justice, RUTH V. McGREGOR, Vice Chief Justice, REBECCA WHITE BERCH, Justice, and CECIL B. PATTERSON, JR., Judge.

NOTE: Due to a vacancy on this court at the time this case was decided, the Honorable CECIL B. PATTERSON, JR., a judge on the Arizona Court of Appeals, Division One, was designated to participate in this case under Article 6, Section 3 of the Arizona Constitution.