NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

LEONARD ESHAYA, *Appellant.*

No. 1 CA-CR 17-0592
FILED 4-23-2019

Appeal from the Superior Court in Maricopa County
No. CR2014-118120-001
The Honorable Ronda R. Fisk, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Robert A. Walsh
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Nicholaus Podsiadlik
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Jennifer M. Perkins and Judge Lawrence F. Winthrop joined.

_____

**B R O W N**, Judge:

¶1          Leonard Eshaya appeals his convictions and sentences for possession or use of narcotic drugs, possession or use of dangerous drugs, possession of drug paraphernalia, and promoting prison contraband. Finding no reversible error, we affirm.

## BACKGROUND

¶2          Detective Chilczek drove to a residential complex that had been the subject of numerous complaints and noticed an unfamiliar car parked in a resident's designated spot. Alerted to reports of possible illegal activity, Chilczek became suspicious of the car and began conducting surveillance. From his concealed location, Chilczek observed Eshaya and a woman, K.B., moving items from a residence to the car.

¶3          Chilczek followed the pair after they finished loading the car and drove away. Before long, he saw Eshaya extend his right arm outside the passenger window to drop a crumpled piece of paper onto the road, prompting Chilczek to ask Detective Goodsen—driving a marked police car nearby—to initiate a traffic stop. During that stop, Goodsen arrested and searched Eshaya, finding pieces of foil, a lighter, and a piece of a pen.

¶4          After completing the search, Goodsen transported Eshaya to the city jail. Upon their arrival, Goodsen asked Eshaya if he had any remaining contraband in his possession, warning that taking contraband into jail is a serious separate offense. Eshaya did not respond. Shortly thereafter, detention officers discovered a pouch in Eshaya's shorts with a glass pipe and multiple baggies containing drugs.

¶5          The State charged Eshaya with one count of possession or use of narcotic drugs (Count 1: heroin), two counts of possession or use of dangerous drugs (Count 2: methamphetamine; Count 3: 25B-NBOMe), two counts of possession of drug paraphernalia (Count 4: pen; Count 5: pipe), and three counts of promoting prison contraband (Count 6: methamphetamine; Count 7: 25B-NBOMe; Count 8: heroin).

**¶6**　　　　At trial, Eshaya testified he first met K.B. at a party. Although they had apparently just become acquainted, Eshaya offered to help K.B. pack some of her belongings for a move and they departed for her apartment. With the car loaded, Eshaya suggested they swim in the apartment complex's pool. Eshaya, who had no swim trunks, entered the hot tub with the shorts he was already wearing. A short time later, K.B. received a phone call and told Eshaya "we need to hurry and get out of here." When they returned to the apartment, K.B. asked Eshaya to grab whatever dry clothing he could find because she did not want him to ride in her car with wet clothing. Eshaya quickly donned a pair of oversized shorts he found on the floor, not noticing the pouch sewn inside them.

**¶7**　　　　At Eshaya's first trial, the jury was unable to reach any unanimous verdict and the superior court declared a mistrial. In his second trial, the jury found him guilty as charged after the court provided an impasse instruction. The court sentenced Eshaya to various terms of imprisonment and this timely appeal followed.

## DISCUSSION

**¶8**　　　　Eshaya argues he was deprived of a fair trial due to prosecutorial misconduct. However, except for one cursory statement in his opening brief, Eshaya does not identify or argue that any single instance of alleged impropriety warrants reversal on its own. Rather, we understand Eshaya's argument to be that the cumulative effect of the prosecutor's alleged misconduct compels us to order a new trial because such misconduct shifted the burden of proof from the State to him.

**¶9**　　　　We therefore address whether the totality of the prosecutor's actions that Eshaya identifies as misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26 (1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)), bearing in mind that reversal is required "only when misconduct is 'so pronounced and persistent that it permeated the entire atmosphere of the trial, indicating that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant,'" *State v. Acuna Valenzuela*, 245 Ariz. 197, 224, ¶ 119 (2018) (citation omitted); *see also United States v. Young*, 470 U.S. 1, 11 (1985) ("Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding."); *State v. Bible*, 175 Ariz. 549, 601 (1993) (recognizing that the touchstone of our analysis is trial fairness).

¶10        Moreover, because Eshaya failed to preserve this objection for appeal we review for fundamental error only. *State v. Sanders*, 245 Ariz. 113, 132, ¶ 91 (2018) (explaining that because the defendant failed to preserve his cumulative prosecutorial misconduct objection at trial, it would be reviewed for fundamental error); *see also State v. Rutledge*, 205 Ariz. 7, 13, ¶ 30 (2003) (holding that an objection based on "shifting the burden" failed to preserve for appeal the issue of prosecutorial misconduct). To establish fundamental error, Eshaya must show that the error either (1) went to the foundation of his case; (2) took away a right essential to his defense; or (3) "was so egregious that he could not possibly have received a fair trial." *State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018). We must reverse if Eshaya establishes error under prong three, but he must "make a separate showing of prejudice" before we may reverse under prongs one or two. *Id.*

### A.     Cross-examination

¶11        At trial, the prosecutor asked Eshaya whether he disputed that he had carried drugs and drug paraphernalia on his person into a city jail. Eshaya said he had, but had done so without knowledge. The prosecutor then asked whether the jury "need[ed] . . . to believe" Eshaya to acquit him, to which Eshaya answered, "[a]bsolutely." The prosecutor followed this question up later with twelve questions asking Eshaya if he "need[ed]" the jury to "believe" certain implausible aspects of his testimony to acquit him. The State concedes that the prosecutor's questions were argumentative but does not agree that they warrant reversal.

¶12        Eshaya analogizes the prosecutor's questions to those condemned in *Pool v. Superior Court*, 139 Ariz. 98 (1984), asserting they were (1) an argument masquerading as questions and (2) intended to "punish him by showing the jury that the state was free to humiliate and demean him." We agree the questions were argumentative but Eshaya's attempt to equate them with the circumstances in *Pool* is inapt.

¶13        "The problem" in *Pool* was "the cumulative effect of a line of questioning in which the prosecutor posed numerous improper questions." 139 Ariz. at 106. The amount of trial time and the sheer number of improper questions in *Pool* created an atmosphere of unfairness and compelled an inference of intentional misconduct by the prosecutor. *Id.* at 109. Here, the twelve questions the prosecutor asked Eshaya are different in both respects. First, they were confined to a brief exchange at the close of cross-examination, mitigating the risk of unfairness. *Compare Escalante*, 245 Ariz. at 143, ¶ 27 (reasoning that improperly admitted evidence "permeated the

trial" when it was "elicited from eight officers over three days and referred to by the prosecutor in both the opening statement and closing argument"), *with State v. Martinez*, 230 Ariz. 208, 215, ¶ 32 (2012) (noting the misconduct in *Pool* was "continuous and well-documented" and declining to reverse when misconduct was "confirmed only twice by the trial judge"), *and State v. Cornell*, 179 Ariz. 314, 329–30 (1994) ("Whatever prejudice this line of questioning produced was mitigated by its brevity . . . .").

¶14 Second, we can reasonably infer a proper purpose for these questions. *See State v. Bolton*, 182 Ariz. 290, 308 (1995) (distinguishing *Pool* because "the prosecutor here did not call defendant pejorative names, refer to matters not in evidence, suggest unfavorable matter for which no proof exists, or abuse defendant in any other way"). The questions appear designed to undermine Eshaya's credibility—undoubtedly a proper purpose—and were asked after multiple attempts by the prosecutor to impeach Eshaya with prior inconsistent statements and Eshaya's concession that he told police officers conflicting stories. To the extent the prosecutor may have crossed the line in posing argumentative questions to Eshaya, the consequences of doing so were mitigated by the prosecutor's phrasing at the end of this sequence. After asking multiple questions phrased in terms of what Eshaya "need[ed]" the jury to believe, the final question began "you are *asking* the jury to believe." (Emphasis added.) This latter phrasing was more clearly designed to attack Eshaya's credibility, not badger him into conceding an incorrect legal position.

### B.    Closing Arguments

¶15 Eshaya also contends two incidents in closing arguments compounded the prejudicial effect of these cross-examination questions so that the jury must have understood that Eshaya was required to prove his innocence.

¶16 Prosecutors' comments during closing arguments must be viewed in context to determine if they exceed the "wide latitude" our precedents afford them. *State v. Goudeau*, 239 Ariz. 421, 466, ¶ 196 (2016). Despite such latitude, the State cannot "improperly argue the burden of proof." *Acuna Valenzuela*, 245 Ariz. at 219, ¶ 88 (quoting *State v. Schneider*, 148 Ariz. 441, 447 (App. 1985)). Prosecutors stay within permissible bounds when their comments "are invited and prompted by opposing counsel's arguments . . . if they are reasonable and pertinent to the issues raised," or "make arguments and . . . draw inferences that are reasonably supported by the evidence." *Id.* (first quoting *State v. Trostle*, 191 Ariz. 4, 16 (1997); and then quoting *State v. Burns*, 237 Ariz. 1, 31, ¶ 152 (2015)). To determine

when prosecutors exceed those bounds, we look to (1) whether the prosecutor's statements called inappropriate matters to the jury's attention and (2) the probability that the jury was in fact influenced by those statements. *Goudeau*, 239 Ariz. at 466, ¶ 196.

¶17        Eshaya first directs us to the following comments from the State's initial closing argument, asserting the prosecutor improperly shifted the burden of proof to him by allegedly instructing the jurors that Eshaya had to create reasonable doubt before they could acquit him.

> And remember, because it's in your instructions, reasonable doubt is not a numerical calculation. . . . Reasonable doubt is whatever you find reasonable. . . .

> . . . [P]roof beyond a reasonable doubt is proof that leaves you firmly convinced. There are few things that we can know for absolute certainty. You don't have to know for absolute certainty. If you find the doubt reasonable, you find him not guilty. You should not find the defendant's story reasonable because it isn't.

The thrust of the prosecutor's argument was that the circumstantial evidence proved Eshaya knew about the drugs in his shorts. The prosecutor repeatedly attacked Eshaya's claim of not noticing the pouch inside his shorts, pointing out it was undermined by Eshaya's own in-court demonstration because he looked down each time he put the shorts on, and the pouch would have been visible from that perspective. Indeed, as defense counsel would later acknowledge in closing argument, Eshaya's story was one that was "not very plausible for most of us." The prosecutor had also recently drawn the jury's attention to the court's instruction regarding the credibility of witnesses and the reasonable doubt standard. Although the prosecutor unnecessarily added some confusion by deviating from the reasonable doubt instruction in the comment quoted above, it is difficult to believe the jury would have understood that it must apply the reasonable doubt standard to Eshaya when the verbal and written instructions explicitly stated it applied to the State's burden of proof. Instead, it is more likely that the jurors would have understood the comments to be part of the broader credibility theme. Moreover, any risk that the jurors would have misunderstood the instructions was mitigated by Eshaya's own repeated insistence that the State's failure to produce certain evidence meant that it could not discharge its burden.

¶18 The second incident Eshaya identifies occurred during the State's rebuttal closing argument, beginning with the prosecutor's statement: "This defendant has an excuse for everything. He *needs you to believe* that he's a victim of just terrible circumstance. So let's go over what it is that *you would need to believe* to find the defendant not guilty." (Emphasis added.) Eshaya objected, arguing that although the prosecutor could argue "that you would need to believe he didn't have knowledge for the following reasons," the prosecutor could not argue that Eshaya was "not not guilty for the following reasons." After conferring with counsel, the superior court did not rule on the objection, and the prosecutor went on to list aspects of Eshaya's testimony she claimed the jury "need[ed] to believe to buy the defendant's story, to find him not guilty." As the prosecutor enumerated the sixth item, Eshaya renewed his objection as burden shifting. The parties and the court reconvened to discuss the objection, and without comment or direction to the jury, the court again allowed the prosecutor to continue the argument unimpeded.

¶19 Viewing these comments in their proper context, we disagree with Eshaya's contention that they prejudiced him by shifting the burden of proof from the State to him for at least four reasons. First, because they concerned Eshaya's own testimony, each comment was reasonably supported by evidence. Second, this portion of the argument was situated within a wider discussion of credibility. Before the objected-to comments, the prosecutor noted Eshaya's testimony was the only evidence that the shorts he displayed to the jury at trial were actually the shorts he wore when taken to the jail after his arrest. Soon after, the prosecutor emphasized that credibility was "really . . . what this case turns on" and "the most important issue." Although the prosecutor initially spoke of what the jury "need[ed] to believe to buy the defendant's story, to find him not guilty," each subsequent use referred to what the jury would "have to believe" to credit Eshaya's narrative and she never again told the jury it could not acquit Eshaya absent that belief. This indicates the prosecutor's awkwardly-stated aim was to undermine Eshaya's credibility, not shift the burden of proof. *See Donnelly*, 416 U.S. at 647 ("[I]mprovisation frequently results in syntax left imperfect and meaning less than crystal clear."). It was in that context the objected-to statements were made and we "should not lightly infer" that the jury "sitting through lengthy exhortation" drew the "most damaging meaning . . . from [a] plethora of less damaging interpretations." *See id.*

¶20 Third, Eshaya's own closing argument repeatedly attacked the sufficiency of the police investigation for failing to collect forensic evidence, arguing the police made no attempt to "find the right person" because they had "a warm body" and so "they didn't want to do this

investigation." Although such comments do not give prosecutors "license to make otherwise improper arguments" in response, their presence may lessen or remove any unfairness concerning the prosecutorial argument in response. *Young*, 470 U.S. at 12; *see Darden v. Wainwright*, 477 U.S. 168, 179–83 (1986) (reasoning that prosecutor's comments, though improper, were not fundamentally unfair where defense's argument, inter alia, blamed the sheriff's office for a lack of evidence). Fourth, the State's burden was mentioned multiple times throughout the trial, including by the court, the defense, and the prosecutor—ameliorating the risk of unfairness. *See Acuna Valenzuela*, 245 Ariz. at 220, ¶ 91.

### C. Cumulative Effect

**¶21** To reiterate, Eshaya's sole argument on appeal is that the cumulative effect of the foregoing alleged instances of prosecutorial misconduct denied him a fair trial. As we have already explained, *supra* ¶ 9, this requires the misconduct to be pronounced and persistent, to infect the entire trial with an atmosphere of unfairness, and to indicate the prosecutor acted intentionally and without regard to how it might prejudice Eshaya.

**¶22** We have reviewed each instance of alleged misconduct Eshaya cites and have concluded that none rise to the level of prosecutorial misconduct. The cross-examination, although argumentative, was neither very egregious nor very long. The comments made during closing arguments were reasonably supported by the evidence, raised in the wider context of a credibility discussion, and made only after both parties repeatedly emphasized the State's burden. The prosecutor's phrasing was less than careful but that does not indicate any malice. Moreover, the jurors were properly instructed on burden of proof multiple times, including when the court delivered its impasse instruction during their deliberations. We see no reason to depart from our usual presumption that the jury followed this instruction. *Goudeau*, 239 Ariz. at 469, ¶ 214. Simply put, Eshaya has failed to demonstrate these isolated incidents over the course of the six-day trial rendered it so unfair as to deny him due process. *Sanders*, 245 Ariz. at 134, ¶ 103; *see State v. Hulsey*, 243 Ariz. 367, 389–90, ¶ 89 (2018) (holding that although the prosecutor "engaged in several instances of misconduct or near misconduct, altogether it was not so prolonged or pronounced that it affected the fairness of trial"); *State v. Schneider*, 148 Ariz. 441, 447 (App. 1985) (reasoning that the court's instruction and the length of trial when compared to isolated argument resolved any prejudice); *see also Donnelly*, 416 U.S. at 645 (same).

**¶23** After considering each of the instances Eshaya identifies as improper conduct, we conclude "[t]he record does not suggest pervasive prosecutorial misconduct that deprived [him] of a fair trial." *State v. Gallardo*, 225 Ariz. 560, 570, ¶ 47 (2010).

**¶24** Recognizing "that we have the luxury of reflecting upon a written record and are not surrounded by the heated battle" of trial, *Pool*, 139 Ariz. at 104 n.7, we nonetheless caution prosecutors to avoid using the awkward language the prosecutor used in this case. Our decision to affirm should not be taken as a license for the State to repeatedly phrase its questions or argue that a jury "must believe" or "needs to believe" a defendant's testimony in order to find him not guilty. The State's responsibility to prove each element of the charged offense is not just *any* "right essential to the defense," *Escalante*, 245 Ariz. at 138, ¶ 1, it "provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law,'" *In re Winship*, 397 U.S. 358, 363 (1970) (citation omitted). Thus, prosecutors would do well to err on the side of caution and not vary from the concepts underlying the standard reasonable doubt instruction.

## CONCLUSION

**¶25** For the foregoing reasons, we affirm Eshaya's convictions and sentences.

